# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84599-3-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| COLE EDWARD KRAUSE, | |
| Appellant. | |

BIRK, J. — The criminal rules permit the State to try multiple criminal offenses against a defendant in a single trial. See generally CrR 4.3(a). But as the Supreme Court explained in State v. Bluford, 188 Wn.2d 298, 311, 393 P.3d 1219 (2017), the interest in the judicial economy of one trial cannot override clear, undue prejudice to the substantial rights of the defendant. In Bluford, 188 Wn.2d at 315-16, and again in State v. Slater, 197 Wn.2d 660, 680, 486 P.3d 873 (2021), the Supreme Court held that undue prejudice occurred when the trial of multiple offenses in a single trial allowed the State to introduce prejudicial evidence of other acts that would have been inadmissible in severed trials. In both cases, the Supreme Court reversed the defendants' convictions on that basis. Bluford, 188 Wn.2d at 316; Slater, 197 Wn.2d at 680.

In this case, the State charged Cole Krause with three counts of rape in the third degree for having sexual intercourse with A.C.S.,[1] A.L., and A.C. without their consent, and one count of rape in the second degree for having sexual intercourse with A.C. when she was incapable of consent. Besides involving three different complaining witnesses, the State alleged the acts occurred in different places, times, and settings. The State never argued in the trial court that any of the alleged acts of rape was admissible on any count other than the one to which each related. By trying the four counts together, the State was able to present, as to each count, evidence of at least two other unrelated and inadmissible acts of rape.

While the Supreme Court has not spoken with one voice about the issue, its most recent decisions in Bluford and Slater control the decision here. In Bluford, a joint trial was reversible error because it permitted the State to put on evidence of inadmissible other acts of robbery, two of which included sexual offenses. 188 Wn.2d at 314-15. In Slater, a joint trial was reversible error because it permitted the State to put on evidence of the inadmissible other act of failing to appear at a court hearing. 197 Wn.2d at 679-80. The question here is whether we can sustain a joint trial that allowed the State to put on evidence of inadmissible other acts of rape. Contrary to the dissent's framing, there is no question about following the "full framework" of the law. Dissent at 1. The "full framework" governing motions to sever is clear, and Bluford and Slater neither contemplate nor permit "contextualiz[ing]" or "minimiz[ing]" into insignificance clear prejudice resulting from

_____

[1] The April 17, 2017 information identified A.C.S. as A.C., but we will identify her as A.C.S. throughout to distinguish from A.C., who was identified in subsequently added counts.

a joint trial. Dissent at 12. Because the prejudice to Krause's rights was at least as great as that which compelled reversal in Bluford and Slater, we reverse and remand.

We additionally conclude (1) the trial court was not required to dismiss one of the counts because it had been charged in an earlier juvenile proceeding that was dismissed, (2) Krause waived any argument that the trial judge was required to recuse, and (3) there was sufficient evidence supporting the count of rape in the third degree of A.C. We do not reach Krause's remaining assignments of error.

I

A

A.C.S. testified that her first communication with Krause was on December 20, 2015, when he contacted her on a social media platform. A.C.S. and Krause went to the same high school. A.C.S. was 27 ½ months younger than Krause. Krause "randomly" messaged her inviting her to go to a party. A.C.S. clarified that she was a freshman because Krause looked older, and expressed reluctance about attending a party. Although Krause brought up sex, A.C.S. was not ready. A.C.S. and Krause continued to correspond over social media, and he sought her out at school.

On January 7, 2016, A.C.S. finished dance practice and went to her locker. No one else was around, but Krause was there and started to kiss her. Krause forcibly guided A.C.S. to an alcove. A.C.S. repeatedly told Krause she needed to leave. Krause turned A.C.S. around, pulled down her pants and underwear, and digitally penetrated her vagina. A.C.S. kept telling him no. Krause turned her

3

toward him, kissed her again, then turned her around again and put his penis inside her vagina. He put his penis in her mouth while holding her head and hair. A.C.S. testified everything hurt, on her and inside her, and there was a lot of blood on her pants and on the ground. Krause used a shirt to wipe up the blood. Later that night, A.C.S. told her parents what happened, police came to her house, and she saw a nurse at a hospital.

A.C.S. testified that some friends later did not want to be friends with her anymore because they saw what was happening to her online. This was because of rumors going around the school and online about what happened between A.C.S. and Krause. These were reasons that A.C.S. switched schools and her family moved out of the area.[2]

In April 2016, the State charged Krause with rape in the third degree of A.C.S. in a juvenile proceeding. After Krause turned 18 in June 2017, juvenile court jurisdiction was extended several times. According to the State, A.C.S. and her family decided not to pursue the case, and, in February 2017, the court granted the State's motion to dismiss the proceeding. According to representations the State later made in the litigation, A.C.S. changed her mind about participating after she learned of A.L.'s January 2017 disclosure of a new charge.

---

[2] We disagree with the dissent that our description of the trial testimony is inadequate to discharing the court's responsibility in determining this appeal. The legal test looks at the "relative strength" of the charges. State v. Russell, 125 Wn.2d 24, 64, 882 P.2d 747 (1994). Determining that the charges were of relatively similar strength does not require that we air in granular detail the traumatic narratives that A.C.L., A.L., and A.C. described at trial, nor that we attach subjective characterizations to their testimony.

B

On January 25, 2017, police received a report from A.L. A.L. testified she attended the same high school that A.C.S. had identified as hers and Krause's. A.L. was approximately 24 months younger than Krause. A.L.'s friend group included Krause. A.L. testified that Krause and her former boyfriend were in the same class, but she said she could not recall if they graduated at the same time because of "everything going on," which she explained, "we all knew what was going on with [A.C.S.] and like that."

A.L. said she had not spent time alone with Krause, but that changed toward the summer of 2016. A.L. described two occasions when she went to Krause's house alone. A.L. testified that "[t]he second" she and Krause were alone, "it just immediately got very sexual." There were times A.L. engaged in consensual sex with Krause, but she said "it just didn't feel right." This occurred three times. On the third occasion, Krause was resistant to using a condom, and without her consent penetrated A.L. without one before putting on a condom after all. After that, A.L. decided she would not have sex with him again because she could not trust him. She informed Krause of her decision.

In late summer 2016, Krause contacted A.L. about socializing after A.L. finished work. A.L. did not wish to do so. While walking home, A.L. saw Krause pull over on the side of the road. Krause asked her join him in his vehicle and smoke cannabis. Although A.L. did not want to, she got in the vehicle because she did not want to be rude and he "kept persisting." He drove to a cul-de-sac where they smoked, and then he grabbed her hair and tried to kiss her. A.L. told

him to stop. When asked, A.L. affirmed that she was "generally aware of the allegations involving [A.C.S.]," and when asked "did that at all play in your mind when you were in the car with [Krause]?" answered "Yes."

After some time A.L. convinced Krause to leave, but Krause said he needed to stop at his mom's house. At the house, A.L. went to Krause's old bedroom. Krause appeared in the doorway and pressed A.L. up against the wall. He started kissing her and she was at that point "really scared" and "petrified." Krause unbuttoned A.L.'s shirt and pants as she told him to stop because she did not want to do this and was scared. Krause raped A.L. vaginally. She cried. A.L. remembered Krause "flipping [her] over like [she] was nothing" and anally raping her, causing physical and emotional pain. A.L. testified she "didn't think something like that would happen to me . . . especially after, like, knowing what happened to [A.C.S.] and just accepting that I was going through exactly what I had said could never happen, you know, because all of us friends had spent so long sticking up for him."

A.L. testified she did not immediately tell her dad what happened, and when asked why testified, "Because I was having trouble accepting what had happened." A.L. texted Krause that night indicating that he had "forced [her] to have sex with [him]" and directing him not to talk to her. The prosecutor asked why, after A.L. had told her friends and her father had found out about the rape, she did not go to the police. A.L. answered she was scared, and "had seen how everyone had treated [A.C.S.]" A.L. affirmed that the things people were saying about A.C.S.

6

were generally "[n]egative." And she affirmed that that influenced whether she wished to come forward with allegations.

Krause initiated text communication with A.L. In their exchange, A.L. wrote " 'I know it was partly my fault.' " She explained, "I couldn't imagine this random act of violence would have just happened to me, and I think in a lot of ways I blamed myself because I did know about [A.C.S.], and I did know that he potentially could be like that." Krause continued texting despite A.L.'s wish to be left alone. Her father saw those text messages, he confronted A.L., she told him everything, and they went to the police.

A.L. and A.C. worked at the same employer at a time after A.L. had gone to the police. The prosecutor asked A.L. if she "let [A.C.] know about what had happened to you with [Krause]?" to which A.L. answered, "Yeah. I confided with her a little bit." A.L. affirmed that A.C. "talked to [her] as well."

The State filed an information on April 17, 2017, charging Krause in an adult proceeding with one count rape in the third degree of A.C.S., and one count of rape in the third degree of A.L. Within three months of the State's re-filing charges, the court heard argument on Krause's motion to dismiss the count concerning A.C.S. because it had been previously charged in a juvenile proceeding that had been dismissed. When the court denied the motion to dismiss, Krause's counsel indicated that Krause would pursue a motion to sever the counts. On January 5, 2018, Krause's original attorney filed a written motion to sever the existing two counts, and on February 2, 2018, new counsel appeared who would represent Krause through trial. Krause would go on to move for severance several times.

7

C

The record does not indicate a motion to sever had been heard when, on November 9, 2018, the State filed an amended information charging Krause with the original two counts of rape in the third degree of A.C.S. and A.L., and additional counts of rape in the third degree and rape in the second degree of A.C.

A.C. testified she attended the same high school as Krause. A.C. was 20 months younger than Krause. A.C. met Krause through a mutual acquaintance and attended a school event with him. A.C. said she and Krause were best friends, and later their relationship became romantic. They dated "[o]n and off" for two years. A.C. testified that she and Krause had a sexual relationship. She described times when he wanted to have sex and she did not want to, and he would either "coerce" A.C. or she would say no but "then I fell asleep and it would end up happening."

When A.C. was 16, she went to a Halloween party. A.C. became intoxicated to the point she "[c]ouldn't really walk" and vomited. A.C. asked another person to give her a ride to Krause's house. Krause helped her, still unstable from alcohol intoxication, to his room. A.C. fell asleep very fast. The next thing she remembered was waking up to her and Krause having sex. She fell back asleep. Although A.C. did not clearly recall what happened, in the morning she spoke to Krause and he said they had had sex.

A.C. described an incident when she and Krause parked on a street in A.C.'s neighborhood. They had consensual sex in the back of the car. Krause wanted to try anal sex, but A.C. told him no. They continued to have sex but at

8

one point Krause penetrated her anally. A.C. told him no multiple times and to stop but he kept doing it. A.C. cried from the pain. A.C.'s and Krause's relationship continued after that. Eventually they agreed to end their relationship and A.C. "cut [Krause] out of [her] life."

A.C. became aware of the incident between A.C.S. and Krause. A.C. testified Krause told her that what happened with A.C.S. was not true. Krause told her the incident did not happen at the school, but after their extracurricular activities he took A.C.S. to a park and they had sex.

A.C. testified that she and A.L. used to be best friends. They met again when they worked for the same employer. A.C. and A.L. had a conversation about Krause. At that point, A.C. had wanted to go the police, but had not done so because she did not want to have years of her life taken up with court. Wanting "to help" A.L., A.C. provided the police a statement "on just how me and [Krause] were in instances that had happened to me."

D

The first hearing on severance in our record occurred on January 26, 2021. Krause's counsel argued that the defense was "renewing" the motion to sever the original counts that had been made and had been denied. This court has no record that the superior court had ruled on the motion, and it appears counsel's belief the motion had been denied was in error. Nevertheless, Krause's new counsel argued the question of severance was now different with the addition of two new charges. However, Krause's counsel also argued the motion turned on witness interviews

9

that he wished to conduct. The State opposed the interviews, Krause did not oppose postponing discussion of severance, and the court agreed to do so.

By February 10, 2022, then just "a few hours" away from starting trial, the defense still understood the motion to sever was awaiting a ruling. The defense again expressed belief that severance had been denied when only two counts were pending, and the trial court judge made a record that that was the case, acknowledging that the defense was moving to sever all counts. The State agreed with that history. Also overlooking that there had not been an earlier ruling, the State argued the court should deny severance for "the same reasons" on which the earlier judge had relied. The State argued that the analysis of cross-admissibility was not limited to whether each "event itself" would be admissible to establish any of the other counts, but whether witness "statements" and "motivations" would be relevant to multiple counts. The State represented, "There is so much cross-admissible evidence that there's no way to coherently tell the story of each of these victims without them being joined." Predicting the evidence on the different charges would be cross-admissible, the court denied the motion.

At motions in limine, Krause raised the objection again to trying the counts relating to A.C. along with those relating to A.C.S. and A.L. The prosecutor alluded to anticipated testimony in which the count relating to A.C.S. would involve

testimony by A.L., and the count relating to A.L. would involve testimony by A.C., linking the three together. The prosecutor explained,

- A.L. would testify that her seeing the harassment of A.C.S. when A.C.S. came forward was part of the reason A.L. chose not to come forward with her allegations until later.

- A.L. had a conversation with A.C. about A.L.'s coming to court in which A.C. disclosed that she also had been assaulted by Krause, and came forward only to help A.L., and

- A.C. had a conversation with Krause when he was arrested in which he gave a statement about where "it" had happened—we understand referring to the count relating to A.C.S.—that was inconsistent with physical evidence.

According to the prosecutor, even if some counts were severed, "I would still be calling all of these witnesses to testify in each other's trials." The court denied severance based on "the interrelation between the allegations and all of these individuals," leading the court to believe they "are cross admissible." In further discussions, the State conceded under the hearsay rule that no complaining witness could testify to acts against any other.

At trial, in addition to A.C.S., A.L., and A.C. who testified as outlined above, the State called a trauma clinical coordinator from Providence Everett Medical Center, who had worked as a forensic nurse examiner. She testified A.C.S. reported on January 7, 2016, that she had been sexually assaulted by Krause. Police testified to their discovery of blood at the school where A.C.S. said she was

raped. While executing a search warrant at Krause's house, police found a shirt matching the description A.C.S. had given them of the shirt Krause used to wipe up the blood. A Washington State Patrol Crime Lab forensic scientist, tested a sexual assault kit, underwear, a shirt, and two reference samples. Krause's and A.C.S.'s DNA were both found in the underwear. Blood matching A.C.S.'s DNA was found on the shirt.

After the State rested, Krause renewed his motion to sever the counts. Krause argued that by blending the cases together, the State had engendered "an improper inference." Citing ER 404(b), Krause argued, "[T]he State should not be allowed to piggy back" one person's decision about consent "allowing it to be considered by the jury in convicting [as to] somebody else" During this colloquy, in regard to judicial economy, the court expressed concern about the additional time jury selection took because of COVID-19.

The prosecutor argued that "there has been no blending." The State relied on "cross admissibility," which it identified as the witnesses testifying to "not only what happened to them, but their knowledge of what was going on" with the others. The prosecutor described this evidence as,

- "[A.L.] being aware of the bullying and harassment [of A.C.S.],"

- "[A.C.] coming forward only because [A.L.] had told her what happened," and

- "[A.C.] spoke to Mr. Krause regarding the incident regarding [A.C.S.]"

Calling this "ample cross-admissibility of the evidence," the State indicated it was "not resting solely on judicial economy" to support denial of severance.

The court denied severance. It concluded that after "having the benefit of the actual testimony, the decision to not sever the offenses is actually bolstered." From the court's belief it was "dealing with evidence that clearly appears to be cross-admissible," the court turned to judicial economy. The court ultimately did not rely on the existence of COVID-19 protocols. The court believed severed trials would be lengthy, and believed "juries can clearly separate the different charges."

Krause testified he had consensual sex with A.C.S., A.L., and A.C. Krause believed A.C.S.'s response demonstrated agreement and denied physically forcing her. He said there was a little bit of blood and he wiped it up with a shirt. Regarding A.L., Krause testified they had made plans to hang out at his house and have sex. He said that when they had sex, he had asked if she was feeling better at that point despite having been too tired earlier, and she answered yes. In regard to A.C.'s attending a party and drinking, Krause claimed A.C. had been drinking, but was able to walk and not nearly to the point of needing to be carried. They spoke and she appeared to follow the conversation. Krause and A.C. discussed anal intercourse on multiple occasions. They did not come to a definitive agreement. At one time, he asked to do so and initiated it, but stopped immediately when she said no. Krause denied raping A.C.S., A.L., or A.C.

In its closing argument, the State urged the jury to view the three complaining witnesses as being connected to one another: "For three young women, [A.C.S.], [A.L.], and [A.C.], their connection to high school and to each other is far more damaging, and it is their connection to [Krause]." The prosecutor said, "[T]here is one verdict for these girls." The jury returned a verdict of guilty on

all four counts, and based on the conviction of rape in the second degree Krause was taken into custody without bail pursuant to RCW 10.64.025. The court imposed a low end, standard range sentence of 17 ½ years in prison.

II

Krause argues that the trial court erred by denying his motion to sever the counts in order to ensure a fair determination of each of them. Based on the totality of Supreme Court decisional law on the issue, we agree.

A trial court may sever offenses on timely motion of the defendant whenever "before trial or during trial" the court determines that "severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). Washington law disfavors separate trials. State v. Grisby, 97 Wn.2d 493, 506, 647 P.2d 6 (1982). "A defendant 'seeking severance ha[s] the burden of demonstrating that a trial involving [all] counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.' "[3] Slater, 197 Wn.2d at 676 (alterations in original) (quoting State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)).

---

[3] "A party must generally move for severance pretrial and renew a denied pretrial motion for severance 'before or at the close of all the evidence.' " Bluford, 188 Wn.2d at 306 (quoting CrR 4.4(a)(2)). If the party does not timely make or renew a severance motion, severance is waived. Id. "When a court considers a pretrial motion to sever, it is generally considering the potential for prejudice. The purpose behind the requirement for renewal is to give the court an opportunity to assess whether there is actual prejudice based on the evidence presented or proffered." State v. McCabe, 26 Wn. App. 2d 86, 94-95, 526 P.3d 891 (2023), review denied, 1 Wn.3d 1032, 534 P.3d 806 (2023). When we review a trial court's severance decision for abuse of discretion, we consider only the information known to the court at the time of its ruling. Id. at 89-90. Because we conclude the last ruling on severance was error requiring reversal based on the prejudice that had then manifested, it is not necessary to review either the propriety of joinder in the first instance under CrR 4.3(a) or the earlier severance rulings.

The potential prejudice to the defendant from trying counts in a single trial must be balanced against judicial economy. Id. at 677. The defendant must show both "that prejudicial effects of joinder have been produced," and "that a joint trial would be so prejudicial as to outweigh concern for judicial economy." Bythrow, 114 Wn.2d at 722. "The failure of the trial court to sever counts is reversible only upon a showing that the court's decision was a manifest abuse of discretion." Id. at 717.

Prejudice may result from joinder of multiple counts for trial when "(1) the defendant may have to present separate, possibly conflicting, defenses, (2) the jury may infer guilt on one charge from evidence of another charge, or (3) the cumulative evidence may lead to a guilty verdict on all charges when, if considered separately, the evidence would not support every charge." Slater, 197 Wn.2d at 676-77. Prejudice may result from joinder also when " 'the defendant is embarrassed in the presentation of separate defenses, or if use of a single trial invites the jury to cumulate evidence to find guilt or infer a criminal disposition.' " Id. at 677 (quoting State v. Russell, 125 Wn.2d 24, 62-63, 882 P.2d 747 (1994)). The Supreme Court has said that "[i]n determining whether the potential for prejudice requires severance," a trial court must consider:

> "(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial."[4]

---

[4] These four considerations first appeared in a different form in State v. Kinsey, 7 Wn. App. 773, 776, 502 P.2d 470 (1972). They were our summary of the reasons why the Supreme Court found the defendants were not prejudiced by joinder in State v. Smith, 74 Wn.2d 744, 755-56, 446 P.2d 571 (1968), vacated in part, 408 U.S. 934, 92 S. Ct. 2852, 33 L. Ed. 2d 747 (1972), overruled by State v. Gosby, 85 Wn.2d 758, 539 P.2d 680 (1975). We described these four

Id. at 677 (quoting Russell, 125 Wn.2d at 63). No one factor is "necessarily preeminent." State v. Watkins, 53 Wn. App. 264, 272 n.3, 766 P.2d 484 (1989). "Rather, all of the factors together are a means of determining whether potential prejudice to a defendant requires severance and must be assessed in that light." Id.

A

To determine whether prejudicial effects of joinder were produced, we consider the factors identified in Russell.

1

Starting with the strength of the State's evidence, all four counts were supported by the testimony of the complaining witnesses that Krause had sexual intercourse with them to which they did not consent, and in the case of the count of rape in the second degree, could not consent. Although the count involving A.C.S. was supported by physical evidence lacking on the other counts, that

---

considerations as elements Smith noted as "preventing prejudice to the defendant." Kinsey, 7 Wn. App. at 776. As Smith originally explained these considerations, all four together indicated that prejudice was absent where (1) the State was not using joinder to bolster weak counts, (2) defendants were not forced to present conflicting defenses, (3) based on the court's instructions the jury could not have considered the evidence improperly, and (4) the evidence on the different counts would have been admissible even in severed trials. 74 Wn.2d at 755-56. In Russell, the court restated the four considerations giving them their present language. 125 Wn.2d at 63 (citing Smith, 74 Wn.2d at 755-56). The four considerations aid in searching out different kinds of prejudice courts have recognized in the simultaneous trial of multiple criminal counts. No case holds that they balance against one another: if prejudice exists for instance because of an unfair inference of propensity, that is not offset for instance because the State is not also trying to unfairly bolster a weak count by joining it with a stronger one. Any prejudice that is discovered to exist must be weighed against judicial economy.

16

physical evidence tended chiefly to prove the physical act and its location. The State only secondarily argued that it proved lack of consent. The other counts were supported by other circumstantial evidence, such as Krause's communications with the complaining witnesses, that similarly proved the physical acts and some of their circumstances. This was not a case in which the State sought to shore up a weak count by joining it with a stronger one.

2

As to embarrassing the defendant in the presentation of defenses to the joined counts, there was separation between Krause's defense to the three counts of rape in the third degree and his defense to the count of rape in the second degree. For the three counts of rape in the third degree, the State had the burden to prove that each complaining witness did not consent to sexual intercourse. On the count of rape in the second degree, the State did not need to prove lack of consent, but rather that A.C. was incapable of consent by reason of being physically helpless or mentally incapacitated. This count was subject to an affirmative defense on which Krause had the burden of proving that he "reasonably believed that [A.C.] was not mentally incapacitated or physically helpless." See RCW 9A.44.030(1). Krause could defend against the three counts of rape in the third degree by maintaining the State failed to meet its burden to prove that the complaining witnesses had not consented. But, he argues, given his burden of proving his own reasonable belief to support his affirmative defense to the count of rape in the second degree, as to that count it was necessary to forgo his right not to testify.

We agree with Krause there was a distinction in his defenses to the two crimes, but we discern no prejudice. He does not make a " 'convincing showing' " that he had " 'a strong need to refrain from testifying' " on the three counts of rape in the third degree. Russell, 125 Wn.2d at 65 (quoting Watkins, 53 Wn. App. at 270). Even "mutually antagonistic defenses will not support a motion for severance unless the defendant demonstrates prejudice." Watkins, 53 Wn. App. at 270; cf. State v. Johnson, 147 Wn. App. 276, 285, 194 P.3d 1009 (2008) ("We rarely overturn a trial court's denial of a motion to sever on the basis of mutually exclusive defenses, even when one defendant tries to blame another."). The State did not impair Krause's ability to maintain adequately consistent defenses to the charges by presenting them at the same trial.

3

The third consideration identified in Russell is the presence of "instructions to the jury to consider each count separately." 125 Wn.2d at 63. Here, the court instructed the jury, "A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count." We presume the jury followed this instruction. State v. Weaver, 198 Wn.2d 459, 469, 496 P.3d 1183 (2021). Accepting that presumption, the jury could not have concluded that Krause was guilty of any one count because it believed he was guilty of any other. But the instructions did not limit the use of evidence to a particular purpose.[5] In other words, the instructions did not place

---

[5] In Smith, evidence of the multiple counts was admissible under ER 404(b) and "[t]he trial court did instruct the jury . . . that evidence of other crimes could be considered on any one count only as it bore on the elements of motive, intent,

any restrictions on the evidence the jury could use to determine guilt as to each count. The trial court did not cabin the evidence in any way, because, as discussed below, the evidence at issue was not admissible for any purpose on the joined counts. With no limitation on the jury's consideration of the evidence, the potential for prejudice from the use of the evidence in the manner ER 404(b) forbids went unchecked. The jury instructions did not mitigate the potential prejudice resulting from joining the counts in one trial.[6]

The dissent says we have misunderstood this factor, because our observation that the instructions did nothing to prevent violation of ER 404(b) is "not how our Supreme Court articulated the factor" in "every case since Smith." Dissent at 8. The dissent explains its view that the Supreme Court in Russell and Slater "could have gone back to Smith" and "required courts to issue" limiting instructions. Dissent at 8. There was no issue in Russell, Slater, or any other cited severance case about whether the court was going to "require" limiting instructions.

---

identity, or common scheme or plan." 74 Wn.2d at 755. Thus, consideration of the instructions became part of the severance inquiry not because a trial court instructed the jury to consider each count separately, but because it instructed the jury to consider the evidence only in a manner consistent with the evidence rules where some evidence was admissible on some counts only for limited purposes.

[6] Krause also argues that the instructions were confusing because the court instructed the jury, "To convict the defendant on any count of Rape in the Third Degree, one particular act of Rape in the Third Degree must be proved," and "you must unanimously agree as to which," but "need not unanimously agree that the defendant committed all the acts of Rape in the Third Degree." Krause argues this "allowed the jury to convict" on all three counts of rape in the third degree even if it did not unanimously agree he committed all three. "We consider challenges to jury instructions in the context of the jury instructions as a whole." State v. Johnson, 180 Wn.2d 295, 306, 325 P.3d 135 (2014). We agree with the State that the " '[t]o convict' " instructions required the jury to unanimously find each crime committed beyond a reasonable doubt.

19

In severance cases, the court requires review of the jury instructions for whether the court properly instructed the jury to consider each count separately. Russell, 125 Wn.2d at 66. The question is, why?

The dissent seems to think the issue is a check-the-box inquiry in which, if the trial court included an instruction that each count should be considered separately, then we deem prejudice assuaged to that extent. But the jury instructions cannot be a factor working against some prejudice irrespective of what the prejudice is and what the instructions say. Nothing the Supreme Court has said casts any doubt on the continued validity of its reasoning in Smith that, in that case, what mattered was the instructions properly cabining the ER 404(b) evidence so that it would not be misused. As noted, the Supreme Court rephrased the factors to their present language in Russell, where the Supreme Court refused to analyze for the first time on review an instruction the defendant had not proposed at trial where the instructions otherwise properly stated the law. 125 Wn.2d at 66. If anything, this suggests the very case-by-case inquiry that we have applied. In some situations, an instruction that the jury decide the counts separately would mitigate some of the kinds of prejudice that could arise from a joint trial, but that instruction did not logically address the kind of prejudice that existed here.

4

The fourth consideration under Russell is the "admissibility of evidence of the other charges even if not joined for trial." 125 Wn.2d at 63.

20

a

The first question is whether evidence of any of the counts was admissible as to any of the others. Urging a harmless error analysis, the State argues that evidence of Krause's acts towards each complaining witness all were admissible to prove each count, observing, "Where *the crimes* are cross-admissible that is one consideration that reduces the prejudice to the defendant." (Emphasis added.) If all the same evidence would have been admitted in severed trials, Krause could claim little prejudice if any from the joint trial. Implicitly acknowledging it never asked the trial court to admit any evidence on this basis and the trial court never did, the State asks us to decide for the first time that "the trial court *would have* admitted the evidence *had it considered* the matter more fully on the record." (Emphasis added.) Pointing to an allowable purpose for other-act evidence, the State argues we should decide that Krause "had a common scheme or plan rendering the other counts cross-admissible under ER 404(b)."

Relevant here, proof of common scheme or plan is admissible "when an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes."[7] State v. Lough, 125 Wn.2d 847, 855, 889 P.2d 487 (1995). This

---

[7] To admit other-act evidence under ER 404(b), " 'the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.' " State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). "Where evidence is admissible for a proper purpose, the party against whom the evidence is admitted is entitled, upon request, to a limiting instruction informing the jury that the evidence is to be used only for the proper purpose and not for the purpose of proving the character of a person in order to show that the person acted in conformity with that character." Id. at 420.

requires the proponent of the evidence to show "not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct are the individual manifestations." Id. at 860. The acts indicating a plan need not be "atypical or unique," but need only exhibit "substantial similarities" that are "naturally explained by a common scheme or plan." State v. DeVincentis, 150 Wn.2d 11, 13, 74 P.3d 119 (2003).

In Lough, the defendant had "rendered four other women, whom he had relationships with, unconscious with drugs and then raped them." 125 Wn.2d at 861. This showed "a larger design to use his special expertise with drugs to render them unable to refuse consent to sexual intercourse." Id. In DeVincentis, a past sexual crime and the charged one shared that the defendant had gotten to know young people through a safe channel, brought prepubescent girls into an isolated environment, normalized nudity to overcome their discomfort, invited massage, directed that they remove their clothes, and had them perform similar sex acts. 150 Wn.2d at 22. It was not an abuse of discretion for the trial court to find a common scheme or plan. Id. at 23-24. And in State v. York, 50 Wn. App. 446, 456-57, 749 P.2d 683 (1987), we upheld evidence of common scheme or plan where the defendant was the instructor of three teenage beauty college students, all of whom attended the college for financial reasons, and he accosted them when they attended to laundering the college towels by forcing them into a restroom near

---

Because we reject the only ER 404(b) purpose the State urges, we need not consider the balance of the test.

the laundry, forcibly silencing them, and forcing sexual acts on them, all between June 1984 and February 1985. We rejected as outside this common scheme or plan a further count of indecent liberties involving neither the laundry nor the restroom nor similar acts. Id. at 458.

The record here does not support admitting evidence of the charged criminal acts to prove a common scheme or plan. The State argues there was a common scheme or plan because Krause "used his position as an upperclassman to get younger girls into situations where he could engage in sexual intercourse without their consent, then covered his actions by pretending they consented." But the charged crimes do not have substantial similarities that are "naturally explained" by their being the execution of a common plan. DeVincentis, 150 Wn.2d at 13. While A.C.S. testified to surprise that an older student would be interested in befriending her, there was no evidence that Krause "used his position as an upperclassman" to "get" A.C.S., A.L., or A.C. "into situations." Rather, Krause learned A.C.S.'s schedule, and A.L. and A.C. testified to meeting Krause socially. The four situations charged all differed: Krause met A.C.S. at the school, picked up A.L. as she walked home from work and took her to his house, allowed A.C. into his house after she became intoxicated at a party, and had an otherwise consensual sexual encounter with A.C. in the back of a vehicle. The State's last element of the "plan" that Krause "pretend[ed] they consented" restates Krause's denial of the State's charges and is a commonality at least among the three counts of rape in the third degree, but is not a fact naturally explained by the existence of

23

a plan. The facts here do not establish a common scheme or plan, and evidence of any one of the counts was not admissible to prove any of the other counts.

b

We must next determine whether Krause was prejudiced because the State's case was unfairly aided by "propensity evidence" that is "explicitly prohibited under ER 404(b)," Slater, 197 Wn.2d at 679, or by an inference of "a criminal disposition," Russell, 125 Wn.2d at 62-63. In Bluford, in several original charging documents, the State charged Bluford with seven counts of robbery in the first degree upon seven different victims, and the State charged two sexual offenses based on Bluford's alleged sexual acts against two of the robbery victims. 188 Wn.2d at 303. In pretrial motions, the State sought joinder of all nine counts, while Bluford sought severance of all nine counts. Id. at 303 & n.1. A jury convicted Bluford on eight counts, acquitting on one count of robbery. Id. at 303.

To define the prejudice to the defendant's rights, the court accepted Bluford's focus on "the cross admissibility of the evidence pursuant to ER 404(b)."[8]

---

[8] Because Bluford waived his motion for severance, the court considered only the issue of joinder. 188 Wn.2d at at 306. Its discussion remains informative of Krause's motion for severance. As the court explained, both joinder and severance require consideration of "the likelihood of undue prejudice to the defendant." Id. at 307-08. " '[T]he trial court should not join offenses if prosecution of all charges *in a single trial* would prejudice the defendant.' " Id. at 308-09 (emphasis added) (quoting State v. Bryant, 89 Wn. App. 857, 865, 950 P.2d 1004 (1998)). The dissent disregards Bluford, saying it is "not pertinent" because it concerned joinder, rather than severance. Dissent at 10. We disagree. Slater, a severance case, relied on Bluford, a joinder case, which in turn relied on Russell and Bythrow, severance cases. See Slater, 197 Wn.2d at 679-80; Bluford, 188 Wn.2d at 311-12, 315; Russell, 125 Wn.2d at 62-63; Bythrow, 118 Wn.2d at 720-21. All of these decisions sought to evaluate prejudice from the joint trial of multiple counts by looking in various degrees of specificity to the factors derived from

Id. at 312.  Evidence of other acts is not admissible "to prove the character of a person in order to show action in conformity therewith."  ER 404(b).  But such evidence may be admissible for other purposes.  Id.  ER 404(b) "reflects the long-standing policy of Anglo-American law to exclude most character evidence because 'it is said to weigh too much with the jury and to so overpersuade them.' "  State v. Slocum, 183 Wn. App. 438, 456, 333 P.3d 541 (2014) (quoting Michelson v. United States, 335 U.S. 469, 476, 69 S. Ct. 213, 93 L. Ed. 168 (1948)).  In Bluford, the State argued, and the trial court had ruled, that evidence of all the robberies would be admissible in the trial of any one of them to show the assailant's modus operandi, and thus the assailant's identity.  188 Wn.2d at 312.  The Supreme Court concluded the modus operandi standard was not met.  Id. at 315.  So, "the State would not have been required (or allowed) to call all of its witnesses in each separate trial."  Id. at 315-16.  The court explained that because of this, "the interest in judicial economy loses much of its force."  Id.

The conclusion that the State would not have been able to put on evidence of the other robberies in the trial of any one of them did not "automatically preclude joinder."  Id. at 315.  It remained the defendant's burden to show that "the prejudicial effect of trying all the counts together outweighed the benefits of joinder."  Id. at 315.  But the scale tipped in Bluford's favor, both because of the lessened weight of judicial economy where the evidence was not "cross admissible" between the different counts, and because—referring to the two

Smith.  There is no justification for ignoring Bluford's analysis of those factors because of its procedural setting.

25

alleged robberies accompanied by sexual offense charges—Washington has acknowledged " 'the inherently prejudicial effect of prior sexual offenses.' " Id. (quoting State v. Bythrow, 114 Wash.2d 713, 718-19, 790 P.2d 154 (1990)). The court reversed Bluford's eight convictions. Id. at 316.

In Slater, the court returned to the issue, this time in the posture of the defendant's motion for severance. 197 Wn.2d at 664. The State charged Slater with one count of felony violation of a domestic violence no-contact order based on his attempt to contact a woman he had previously dated. Id. at 665. When the case was called for trial, Slater failed to appear, and the State added a charge of bail jumping. Id. at 666. Slater moved to sever, arguing that, in the trial of the charge of violating the no-contact order, evidence of Slater's failure to appear was other-act evidence inadmissible under ER 404(b). Id. at 666. Two successive trial court judges ruled that evidence of Slater's failure to appear was admissible in the trial of the charge of violating the no-contact order, and therefore the evidence relevant to the two counts was "cross admissible." Id. at 666. The State argued the failure to appear was "evidence of flight and consciousness of guilt." Id. at 671. The Supreme Court disagreed, holding inferring consciousness of guilt from Slater's failure to appear was not "more than mere speculation." Id. at 674.

With cross-admissibility eliminated, although acknowledging the conclusion was not automatic, the Supreme Court nevertheless found the prejudice to the defendant of trying the counts together outweighed concern for judicial economy. Id. at 679. Again the Supreme Court's explanation of the prejudice to the defendant is informative. Both counts in Slater—violation of the no-contact order

and failure to appear—"involve[d] violations of court orders," so there was "higher than normal prejudice in trying these two charges together." Id. The very similarity of the acts made a joint trial more prejudicial than normal, given that the charges were "not connected or related in any way."[9] Id. at 680. Where there was no overlap among witnesses, the failure to appear was not admissible in the trial of the charge of violation of the no-contact order, and there was a risk of improper propensity inferences, the prejudice to the defendant outweighed any judicial economy. Id. The Supreme Court reversed. Id. Compounding the error in Slater was the State's subsequent closing argument, which the Supreme Court ruled was prosecutorial misconduct, because its focus on Slater's "propensity to violate court orders highlighted the exact prejudice that Slater argued in his motion to sever." Id. at 683. Bluford and Slater indicate that the risk of improper propensity inferences weighs strongly in favor of severance when multiple counts joined at trial pose that risk and evidence of them would not be admissible in severed trials.

---

[9] In contrast, in McCabe, the defendant did not show prejudice where the State charged him with theft and trafficking of four buckets of paint, and joined an unrelated and dissimilar possession charge based on the defendant's being found in possession of methamphetamine when he was arrested 10 days later for the theft and trafficking. 26 Wn. App. 2d at 90. McCabe shows when joinder of a further count is not prejudicial in spite of its different evidence being inadmissible on the other counts. Without more, a jury would not obviously conclude McCabe stole the buckets of paint because he had the character of one who possesses methamphetamine. As Slater explains, it is different when the State charges a person with a given kind of offense and uses joinder to add additional complaining witnesses giving evidence of unconnected crimes showing the defendant's having a character of committing that very kind of offense. 197 Wn.2d at 680.

27

This is because the joint trial invites the jury to cumulate otherwise inadmissible evidence to find guilt or infer a criminal disposition. This prejudice existed here.[10]

5

Consideration of the four factors thus indicates the presence, as the result of the joint trial, of inadmissible other acts of rape, contrary to the "long-standing policy of Anglo-American law." Slocum, 183 Wn. App. at 456. Without disputing this, the dissent offers a different approach to the four factors, and one it sees as bypassing Bluford's and Slater's response to the same prejudice. In both cases, the dissent emphasizes, the Supreme Court discussed only cross-admissibility, without a factor-by-factor discussion of the other three factors. As to Bluford, the dissent complains that once it became clear the different charged acts were not admissible to prove one another, the Supreme Court neglected to offer "further discussion of facts that may have contextualized or minimized the quantum of

---

[10] The dissent admits that this case has the same propensity problem that existed in Slater. Dissent at 15-17. The dissent nevertheless attempts to distinguish Slater. The dissent perseverates about whether evidence of collateral sexual offenses would be particularly prejudicial when not admissible (a question whose answer seems obvious), but seems to recognize it is not a question that needs to be answered because the propensity problem is the same. The dissent explains the prosecution's capitalization in closing was worse in Slater than it was in this case, a point on which we agree, though the dissent just ignores the transcript when it argues that capitalization was "not present" in this case. Dissent at 16. Finally, the dissent confuses the issue of whether the counts in this case were *connected or related*, which is the point discussed in Slater, with whether they were *similar*. Those are two different things. The charged acts of rape in this case were not connected or related to one another in any way, even though at least one complaining witness had some testimony relevant to a count involving another. All of this establishes that Slater is not identical. The situation, even by the dissent's telling, remains that the significant prejudice is the same as in Slater, and secondary aggravators are present to a degree. That is hardly a foundation on which to call Slater "largely distinguishable." Dissent at 17.

prejudice." Dissent at 12. And the dissent says Slater made the same mistake by not resorting to the other three factors to explain away the clear prejudice that existed once cross-admissibility was eliminated. Dissent at 13-14. The dissent argues that there was strength in the charges against Krause in an absolute sense (as opposed to compared to one another, which is the proper focus in this setting), and that an instruction to consider them separately was given thus satisfying the "standard" (in a check-the-box sense). The dissent says that these factors, which were not discussed in Bluford and Slater, add context that was lacking in those cases allowing the clear prejudice from the inadmissible other acts to be viewed as a lesser problem here than it was in those cases.

By this reasoning, Bluford and Slater would be controlling only on lower court judges who do not apply all four factors, but in no way limit lower court judges who like the dissent can see in the other factors a way to "contextualize[]" and "minimize[]" prejudice disclosed in discussion of any one of them. The dissent thus depends entirely on its theory that the four factors balance against one another, dissent at 18, not just to downplay the prejudice to Krause, but also to distinguish Bluford and Slater. If that is not how the factors work, then the dissent's argument and its effort to distinguish Bluford and Slater both collapse.

The dissent fails to cite a single case in which a court held that the four factors balanced against one another to offset prejudice that one of them clearly disclosed. Logic does not support that approach, either. The dissent emphasizes its assessment of the strength of the State's evidence as minimizing the prejudice resulting from the inadmissible acts of rape. But if evidence is inadmissible within

the meaning of the evidence rules, it does not become less inadmissible because of the existence of other, separate evidence. If unimpeachable DNA evidence implicates a defendant in a murder, ER 404(b) still bars the State from proving the defendant committed the murder through evidence that the defendant committed other, unrelated murders. Indeed, the Supreme Court has suggested that such a case would probably call for severance. Russell, 125 Wn.2d at 64. The existence of overwhelming other evidence might make an ER 404(b) error a harmless one, but it does not make ER 404(b) evidence less inadmissible. Here too, the inadmissible character of the other acts of rape is not affected because other evidence is strong, or even very strong.

The dissent seems to invoke two cases in support of its balancing theory. The first is York, in which the dissent found a critical word that it offers up as proof positive, for York "noted several factors which may *offset* the prejudice from the joinder." 50 Wn. App. at 451 (emphasis added). The dissent emphasizes the word "offset." But the line in York the dissent quotes has nothing to do with balancing the factors against one another. In York, the court did what we did, Russell did, and Slater did: it started by defining the different kinds of prejudice that may result from combining multiple counts following Smith's description of those dangers adopted from Drew v. United States, 331 F.2d 85, 88 (D.C. Cir. 1964). York, 50 Wn. App. at 450-51. Then, the court did what we did, Russell did, and Slater did: it explained that we look at several factors that would indicate the possible prejudice did not come to pass. It was in that breath that York said the factors "may offset the prejudice." Id. at 451. This is nothing revolutionary. As originally

30

wrought, the factors simply restated the absence of the kinds of prejudice the court has to be on the lookout for when deciding severance motions.

We agree, in other words, that the factors all work against the possible prejudice resulting from a joint trial. But York said only, and correctly, that the factors may offset *the prejudice*. It never said the thing the dissent claims, that they may offset *one another*. And York did not hold that any did, either. It could not have done, because in York, every factor indicated the absence of prejudice. Id. at 451-52, 457-58. York was a case in which the multiple charged acts were admissible as evidence of common scheme or plan. Id. at 457-58. The only extent to which the trial court admitted evidence in violation of ER 404(b) was harmless because the trial court eventually instructed the jury to disregard that evidence entirely. Id. at 458. The critical point in York was that the defendant had used a common plan to carry out the three charged rapes, so evidence of each act of rape was admissible in the trial of any one of them to prove that plan. Id. at 453, 457-58. If the counts had been severed, the evidence of the other acts of rape would still have been presented for that limited purpose, and, by joining the counts, the State had to prove the same plan only one time instead of in multiple identical presentations. Thus, in York, the prejudice from a joint trial was minimal and the judicial economy high. But York gives no support to the dissent's theory, and never even hinted, that if a joint trial resulted in significant, otherwise obviously inadmissible ER 404(b) evidence, that kind of prejudice could be viewed as less weighty as long as the court thought the evidence strong overall.

31

The only other decision the dissent seems to cite in support of its theory of balancing the factors against one another is Russell.  The dissent refers to its evaluation of the "totality" of "the four Russell factors," and then segues to the comment in Watkins that the factors "*together*" aid in determining whether prejudice requires severance.  Dissent at 16.  This time, the dissent emphasizes the word "together."  But emphasizing the word does not mean it carries the meaning the dissent attaches to it.  Contrary to the implications we infer from dissent's use of emphasis, we agree the factors must be considered "together."  We have already said that the possible prejudice resulting from a joint trial cannot be assessed without going through all four factors, one after the other, and therefore, all of them together.  But when there is serious prejudice for one reason, the court cannot treat it as having minimal importance simply because there isn't different prejudice for a different reason.

As with York, Russell could not have supported the dissent's theory, because it was another case in which all four factors showed there was not prejudice from a joint trial.  Russell, 125 Wn.2d at at 64-68.  Yet again, the dissent is relying on a case in which the separate charged acts were cross-admissible for a proper purpose under ER 404(b), in Russell, to show identity because of the unique circumstances common to each of the three murders.  Id. at 68.  In the court's discussion of each of the four factors, the court never even hinted that prejudice found to exist could be treated as less significant for its possible effect on the trial simply because there was not also some other prejudice.

Despite claiming to offer up the "traditional" analysis, dissent at 2, the dissent does not offer a single case in which a court found prejudice from a joint trial, but then held it was offset by the fact some different circumstance did not create some different prejudice. The dissent offers a few lines quoted from case law, with a seemingly helpful word here or there italicized. What the dissent does not provide is either a reckoning with the different facts of the cases it cites or a single case performing the analysis in the way it proposes. Where the dissent fails to provide citation to support a legal argument, we assume the dissent has found none. 21st Mortg. Corp. v. Nicholls, 25 Wn. App. 2d 795, 806, 525 P.3d 962, review denied sub nom. Robertson v. Residential Funding Co., LLC, 1 Wn.3d 1023, 532 P.3d 162 (2023).

B

Once the court has determined the nature and the extent of any prejudice resulting from joinder, the court turns to the question whether any prejudice outweighs the judicial economy of joining the counts in one trial. Slater, 197 Wn.2d at 677 ("Prejudice must also be weighed against the need for judicial economy."); Russell, 125 Wn.2d at 63 ("In addition, any residual prejudice must be weighed against the need for judicial economy."). The "fundamental principle" is that " 'the joinder of counts should never be utilized in such a way as to unduly embarrass or prejudice one charged with a crime, or deny him a substantial right.' " Bluford, 188 Wn.2d at 309 (quoting Smith, 74 Wn.2d 774, 754-55, 446 P.2d 571 (1968), vacated in part, 408 U.S. 934, 92 S. Ct. 2852, 33 L. Ed. 2d 747 (1972), overruled by State

v. Gosby, 85 Wn.2d 758, 539 P.2d 680 (1975)).  Judicial economy cannot override "clear, undue prejudice to the defendant's substantial rights."  Id. at 311.

1

a

The State did not argue in the trial court, and we reject its argument here, that the alleged acts of rape were admissible to prove other counts.  But the State points to five instances of evidence that it says would be "cross admissible" in that, according to the State, the complaining witnesses each had some evidence to give that was admissible on counts relating to the others.  The State correctly recognizes that this concern properly enters the analysis by adding to the weight of judicial economy in holding one trial.

The State first argues, for the first time in this court, that Detective Heidi Froisland "investigated each case" and "would have been called by the State in each of two or three trials."  The State called Detective Froisland on the fourth day of testimony to testify about her investigation of the charge concerning A.C.S.  Then the State recalled Detective Froisland two days later on the sixth day of testimony, to testify about her investigation of the charge concerning A.L.  After just nine pages of testimony about that count, the prosecutor ended his questioning of Detective Froisland, reserving the right to recall her a third time about her investigation of the charges concerning A.C.  The State elected not to bring Detective Froisland to court a third time, but plainly the State was unconcerned with requiring Detective Froisland's appearance in court as many times as it wished to accommodate its trial strategy.  We reject the State's argument that it

needed to join the counts so that it could realize judicial economy by calling Detective Froisland only once.

The State argues, second, that A.C. was a witness on the count concerning A.C.S. It is clear that she was. According to A.C., Krause told her that what happened with A.C.S. was "not true." He told A.C. that he and A.C.S. had sex in a nearby park. Both Krause's admission that he had sex with A.C.S. and his false statement about its location were probative of the State's case against Krause for the count concerning A.C.S.

The State argues, third, that A.L. was a witness on the count concerning A.C.S. But the State never established this. Relying on its April 17, 2017 affidavit of probable cause signed by the prosecutor, the State argues that after A.C.S. decided not to participate in the juvenile court proceedings against Krause, she decided to come forward again after Krause was arrested based on A.L.'s report. To the extent of our record, the State points to no admissible evidence that this is true. Nor did the testimony at trial support the State's theory. No evidence suggested that A.C.S. delayed reporting and A.C.S. did not testify that she decided to move forward based on A.L.'s report. The State's argument that hypothetically Krause could "impeach [A.C.S.] with changing her mind about prosecuting" is unconvincing. The State provides at most tenuous grounds to try to make A.L. a witness on the count concerning A.C.S., and in turn only weakly supports a need to join the counts for the sake of judicial economy.

The State argues, fourth, that A.C.S. was a witness on the count concerning A.L. The State gives two reasons for this. First, it points to A.L.'s testimony that she was "generally aware" of the allegations involving A.C.S., and this played in her mind when she was in the car with Krause. Second, the State points to A.L.'s testimony that she did not believe something like the rape would happen to her knowing what had happened to A.C.S. and having supported Krause. This influenced A.L.'s willingness to come forward, and the State says it is relevant to explain her delay in reporting. The argument that A.C.S. was a witness on the count concerning A.L. turns on A.L.'s testimony about A.L.'s knowledge of A.C.S.'s report and its effect on A.L.'s state of mind. At trial, the State never asked A.C.S. about A.L.'s knowledge or A.L.'s state of mind, so, leaving aside the question whether A.C.S. could be a proper witness on this subject, the State only proved it could try all the counts without this evidence.

The State argues, fifth, that A.L. was a witness on the counts concerning A.C. Again, however, the State tries to prove this by pointing to A.C.'s testimony, not A.L.'s. At trial, the State elicited A.C.'s testimony that she had not wanted to become involved in court, but eventually reported Krause to the police after she and A.L. met again while working for the same employer, they had a conversation about Krause, A.C. wanted to help A.L., and A.C. went to the police to give her statement for that reason.

The State's third, fourth, and fifth theories of cross-admissibility suffer from two defects. The first is that the State did not ask the complaining witnesses about all these points to prove other counts. This shows the State could effectively

36

present the case without much of this evidence. The second is that each involves the state of mind of the complaining witness relevant to the count concerning that witness, based on *that witness's* understanding of the acts or statements of another. When that is the issue, what matters is the witness's own understanding of the other's acts or statements, and often the witness may relay their understanding for that limited purpose, to a limited extent, and not for the truth of the matter asserted. Cf. State v. Chenoweth, 188 Wn. App. 521, 534, 354 P.3d 13 (2015) (allowing police officer to generically describe accusations of sexual abuse to explain the officer's investigation). To take one example, if the State needed to prove A.L.'s state of mind based on A.L.'s beliefs about facts in which A.C.S. was involved, it does not follow without more that A.C.S. is a necessary witness.

As the State presented the evidence, other than Detective Froisland whom the State voluntarily chose to call serially without inconvenience, the only cross-admissibility in the testimony was A.C.'s testimony about Krause's admissions relevant to the count concerning A.C.S. By the time of trial in 2022, A.C. needed to travel from Georgia to be a witness. The State is correct, therefore, that a unitary trial limited potential inconvenience to A.C. that severed trials would have implicated.

b

The dissent claims we use an improper "standard" in analyzing the importance of the State's proffered cross-admissible evidence. Dissent at 20. The dissent again misrepresents our analysis. The dissent complains that we use a "necessity" standard, when it asserts the State was not required to show "need" or

"necessity" of the testimony. Dissent at 20. Instead, the dissent says the State had only to point to some "overlap" or "interrelation" in the evidence, to the extent the State would "reasonably" call any one witness in at least one other case. Dissent at 20. We have said nothing to the contrary. We agree there is judicial economy to be gained where the State would "reasonably" call a witness on two different counts. But that wasn't the State's argument at trial, and the test doesn't look merely at whether judicial economy exists, it looks at the weight of the judicial economy to be gained in comparison to the weight of the prejudice. Whether a witness is a necessary one or one the State might wish to call in fulsomeness is an appropriate consideration when weighing the judicial economy to be gained. And in accusing us of applying the wrong standard, the dissent forgets that it was the State's argument that it was a necessity to call the different witnesses on all the different counts. It was the State that argued to the trial court, in attempting to put as much weight on the judicial economy side as it could, that there was "no way" to "coherently" tell the story of each count without calling all three complaining witnesses. That was never true.

In this case the State has identified what it thinks the cross-admissible evidence was to be (much of which it never offered). In evaluating the weight of the judicial economy to be had from joint trial here, we have a few points of evidence, much of which the State never offered, and none of which had the importance the State represented before trial. We agree the evidence did not need to be "necessary" to the State's case in order to support some level of judicial

38

economy in a unified trial, but it cannot support the weight of judicial economy the State portrayed when it was not in fact necessary to the State's case.

2

The State on appeal and the dissent resurrect an argument the State made at trial and on which the trial judge ultimately did not rely, the fact this trial occurred two years into the COVID-19 pandemic and courts faced backlogs and still reluctant jurors. Dissent at 23-24. The dissent does not examine the case law we have developed on the intersection of COVID-19 responses and the right of a criminal defendant to a fair trial. We have said in relation to COVID-19 protocols that trial courts "within the confines of reasonable discretion," may "balance the need for public health and safety with the defendant's trial rights." State v. Ferguson, 25 Wn. App. 2d 727, 738, 524 P.3d 1080, review denied, 1 Wn.3d 1022, 532 P.3d 150 (2023). But we have upheld alterations to criminal trials because of COVID-19 only where the impact on the defendant's rights was "not onerous," and where "[n]o reasonable juror would draw any inference personally against" the defendant because of them. Id. at 738-39. That is because COVID-19 protocols "are simply not comparable to other inherently prejudicial decisions, like requiring the defendant to wear prison clothes or restraints that could signal dangerousness," and, where we have approved alterations, "impermissible factors were not brought into play." Id. at 739-40.

But this case has all of the features we have warned would not justify an alternate procedure because of COVID-19. The very problem with denial of severance in this case was the likelihood that the jury would draw an improper

39

propensity inference personally against the defendant, where collateral other-act evidence is improper because it signals dangerousness, and is an impermissible factor under the evidence rules.  Nor does the State or the dissent explain how denial of severance followed from proceeding "in accordance with the Supreme Court's emergency orders."  State v. Griffin, 30 Wn. App. 2d 164, 171, 544 P.3d 524, review denied, 3 Wn.3d 1015, 554 P.3d 1227 (2024).  To the extent of the cited authority, the pandemic provided no justification to tolerate unfair prejudice in the defendant's criminal trial.  We are not persuaded either that the marginal additional delay of severed trials or the fact of trial under COVID-19 protocols adds significantly to the weight of judicial economy.  Each was a reason trying the four counts might take several weeks or months, but neither would have marginally added significant additional delay where it had already taken from 2017 until 2022 to bring the case to trial.

3

As matters stood at the close of the State's evidence, Krause had established "that prejudicial effects of joinder have been produced."  Bythrow, 114 Wn.2d at 722.  By joining the counts, in the case of each count the State was allowed to elicit evidence of at least two other inadmissible acts of rape, and at least two other witnesses testifying that Krause violated their lack of consent to sexual intercourse with him.  It was allowed to do this without even a theory of admissibility, and therefore without any limitation in the instructions guarding against the use of this evidence in the manner ER 404(b) forbids.  Just as Slater observed that the similarity of another inadmissible act of violating a court order

exacerbated prejudice, the similarity of two other inadmissible acts of rape raised the prejudice at least as much, and almost certainly more. 197 Wn.2d at 680. Eliciting almost no facts from the complaining witnesses other than their own narratives and states of mind, the State showed that it was not necessary, as it had claimed before trial, to call all three of them to tell their individual stories "coherently." And as in Slater, the State then unfairly capitalized in closing when it urged the jury to view them in common and give them "one verdict."

Against this prejudice, the State has shown overlap of at least one witness, A.C., who faced a difficult trip to court, across the country, for trial proceedings. This distinguishes Slater somewhat, where there was no overlap of witnesses. 197 Wn.2d at 680. But the State's argument overlooks the presence of other, inadmissible acts of sexual violence while narrowly focusing on the presence of one or perhaps two or three witnesses slightly overlapping on somewhat peripheral points. Given that the prejudice is identical to that in Bluford and in Slater, and likely much greater, the prejudice still outweighed concern for judicial economy.

While this result follows from Bluford and Slater, other decisions of the Supreme Court point in a different direction. In State v. Kalakosky, 121 Wn.2d 525, 529, 536-37, 852 P.2d 1064 (1993), the court affirmed denial of severance of four counts of rape and one count of attempted rape against five complaining witnesses, each of whom "described quite a different episode even though there was much in the rapist's methods that was the same." While seemingly

compelling, on close inspection Kalakosky is not helpful to the State.[11]  The issue

in that case was whether Kalakosky was the perpetrator.  The individual features

of each rape tended to be the ones that independently pointed to Kalakosky as the

perpetrator (the torn western shirt, the metal piece in the back of the car, the DNA,

the white pickup, and Kalakosky's being seen and having a bandana with hairs like

the victim's).  Id. at 538-39.  This makes the case dissimilar to Krause's.  The torn

western shirt implicating Kalakosky on one count did not suggest the kind of

propensity inference discussed in Slater relevant to the other counts.  In contrast

here, successive complaining witnesses attesting to Krause's having sexual

intercourse with them without their consent clearly carries that risk.  And although

it was not relied on by the Supreme Court, because in Kalakosky the trial court had

found a common scheme or plan, it had instructed the jury that they could consider

the evidence of the "other counts" only for that purpose.  Id. at 539.

The State also relies on State v. Markle, 118 Wn.2d 424, 823 P.2d 1101,

1103 (1992).  That case concerned two counts of statutory rape (improperly

amended at trial to indecent liberties) as to L., joined with one count of indecent

liberties as to S.  Id. at 427, 437.  The relevant issue was severance of the count

as to S.  Id. at 426.  She testified that while sleeping over at the defendant's with

L. and others, she saw the defendant with his hand down L.'s sleeping bag, then

---

[11] The State cites Kalakosky, but only for the point that severance is not necessarily required when the jury can separate and compartmentalize the evidence on the different counts.  But difficulty in separating the evidence on the four counts against Krause (there is none) is not the reason why their joinder in one trial was prejudicial.  Rather, it was the risk of an impermissible propensity inference that created the prejudice here.

the defendant later took the two of them driving and rubbed S.'s buttocks, and then he placed his hand on her while in her sleeping bag. Id. at 429. S. was witness to certain acts towards L., and towards herself in a setting during which L. was present. Id. at 439. L. went on to testify to much additional conduct at other times and outside S.'s presence. Id. at 429. Without engaging in a cross-admissibility analysis, the Supreme Court relied on the similar acts, similar method, and commonality of time and place to justify joinder, and said of denial of severance only, "[s]ome of the alleged incidents involving the two separate victims were contemporaneous, and joint trial was not prejudicial so as to outweigh the concern for judicial economy in this case." 118 Wn.2d at 439. This again speaks to the jury's ability to separate evidence concerning different acts. But the prejudice in this case was the risk of a propensity inference from one unrelated act to another.

The prejudice from trying the counts together where the evidence of each was not cross-admissible outweighed concerns for judicial economy. The court erred by denying Krause's motion to sever after the State rested.[12]

C

"[M]isapplication of ER 404(b) in severance cases does not compel a new trial where, within reasonable probabilities, the error is harmless." Watkins, 53 Wn. App. at 273. The State argues that harmless error can apply in "at least two different ways." We have rejected its theory that the evidence would have been cross-admissible under ER 404(b). Otherwise, for nonconstitutional error, we ask

---

[12] We hold only that it was error to try the four counts together. We express no opinion on whether joinder of fewer than the four counts together would be allowable. See Bluford, 188 Wn.2d at 312 n.5.

whether within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. State v. Barry, 183 Wn.2d 297, 303, 352 P.3d 161 (2015). Other than its effort to show admissibility under ER 404(b) for the first time on review, the State does not argue that this standard is met. The case is analogous to Bluford and Slater, and must be reversed for the same reasons. We address remaining issues that are likely to arise in the event of retrial.

III

After the State filed the adult criminal proceeding, Krause moved to dismiss the count concerning A.C.S., which the State had filed and dismissed in an earlier juvenile proceeding. Krause argued, "[W]hile there was no delay in filing the information, a delay in the prosecution of this case did occur that resulted in loss of juvenile court jurisdiction." Krause argued that the State had engaged in a form of prejudicial preaccusatorial delay, and that the State had engaged in mismanagement justifying dismissal under CrR 8.3(b). On appeal, Krause argues that while he "could not demonstrate the State intentionally dismissed the case so it could later be filed in adult court, the fact remains that it was the prosecutor's decision to dismiss the charge in the first instance," as a result of which Krause "lost juvenile jurisdiction and the collateral benefits" thereto.

The United States Supreme Court has "held that a preaccusatorial delay can result in a due process violation even where the statute of limitations has not expired." State v. Oppelt, 172 Wn.2d 285, 288-89, 257 P.3d 653 (2011). Courts use a three-part test to evaluate claims of preaccusatorial delay, under which (1)

the defendant must show he was prejudiced by the delay, (2) the court must consider the reasons for the delay, and (3) if the State is able to justify the delay, the court must undertake a further balancing of the State's interest and the prejudice to the accused. Id. at 290. The "ultimate test is 'whether the action complained of . . . violates those fundamental conceptions of justice which lie at the base of our civil and political institutions.' " Id. (alteration in original) (internal quotation marks omitted) (quoting Alvin, 109 Wn.2d 602, 604-05, 746 P.2d 807 (1987)). "Whether due process rights are violated by a preaccusatorial delay is a question we review de novo." Id. "Because our review is de novo, we examine the entire record to determine prejudice and to balance the delay against the prejudice." Id.

We decline to analyze Krause's case as one of preaccusatorial delay. In Oppelt, law enforcement timely referred potential charges against Oppelt to the prosecuting attorney's office. 172 Wn.2d at 288. However, the investigative report and referral "never made it" to the prosecutor until shortly before the State filed charges nearly six years later, though within the statute of limitations. Id. The question was whether the government's delay was "severe enough to warrant dismissal." Id. at 287-88. It was not. Id. at 296. But there was not a similar delay in this case. The State originally filed the juvenile proceeding in April 2016, within four months of A.C.S.'s January 2016 report to police. Krause does not rely on this as a delay, but rather points to the State's later decision to re-file the charge in this adult proceeding. This kind of delay does not fit into the framework of Oppelt

or any other case Krause has cited, because Krause was given timely notice of the charges against him.

If the preaccusatory delay framework applied, there would also be justification for the State's timing. The State's timing was driven by A.C.S. and her family's decision not to participate, followed later by A.C.S. changing her mind after A.L.'s allegations came to light. The adult proceeding was filed in April 2017. Some authority has been said to support that a "deliberate delay to circumvent the juvenile justice system violates due process." State v. Calderon, 102 Wn.2d 348, 353, 684 P.2d 1293 (1984), modified by Oppelt. But there is no evidence of a deliberate delay here. In Calderon, the court assumed that the loss of juvenile jurisdiction could be prejudice under the preaccusatorial delay framework, but denied relief because the State had valid reasons for its charging delay. 102 Wn.2d at 353-54. Because here there was no charging delay, Krause's claim of violation is all the less compelling than the defendant's in Calderon, given the State's similarly having justification for its timing. These circumstances do not offend our " 'fundamental conceptions of justice which lie at the base of our civil and political institutions.' "[13] Oppelt, 172 Wn.2d at 290 (internal quotation marks omitted) (quoting U.S. v. Lovasco, 431 U.S. 783, 790, 97 S. Ct. 2044, 520 L. Ed. 2d 752 (1977)).

---

[13] For the same reason, Krause's claim that the trial court erred in denying Krause's CR 8.3(b) motion fails because he has not shown governmental "mismanagement," or "arbitrary action or governmental misconduct." State v. Michielli, 132 Wn.2d 229, 239-43, 937 P.2d 587 (1997) (citing CrR 8.3(b)).

IV

Krause argues the trial judge should have recused because the judge was "burdened by a conflict of interest" because when the judge was still practicing as an attorney, his signature on a pleading in the case. The document at issue is Krause's January 5, 2018 written motion to sever the then-pending counts relating to A.C.S. and A.L. The motion bears the typed name and bar number of Krause's then attorney, but the handwritten signature and bar number of the judge, who was an attorney in the same office at the time. At a hearing in court that day, two other attorneys not named on the motion appeared for Krause and asked that motion be heard later.

The judge raised the issue at a hearing more than three years later, on January 26, 2021, at a hearing on defense motions to sever and for new defense counsel to interview witnesses. The judge advised the parties that he had seen the filing and had no explanation for it. The judge had "looked through [his] records[,] . . . never represented Mr. Krause[,] . . . [and had] no knowledge of this case other than what's contained in the pleadings" and had "absolutely no explanation for why that would be there." The court invited comment from counsel. The State offered no objection, and defense counsel stated,

> I accept what the court is saying at face value; however, I think it is appropriate for me to have a conversation with my client. That being said, I think we can go forward with this hearing today, and I will discuss with my client if he sees any issue. . . .
>
> . . . Basically, it's going to be the State's record, so if they are okay going forward, then we can go forward.

The court instructed Krause's counsel that "if you have some issue after speaking with your client further, please bring that to the Court's attention." Trial occurred more than a year later before the same judge starting on February 28, 2022. Krause did not re-raise the issue.

Krause asserts that "recusal is mandatory where the judge represented the defendant in the very same matter," citing principles of due process and In re Disciplinary Proceeding Against Michels, 150 Wn.2d 159, 162, 75 P.3d 950 (2003) (judge suspended for acting as a judge and lawyer in the same case). Rule 2.11 of the Washington State Code of Judicial Conduct states in relevant part, "A judge shall self-disqualify" in proceedings in which the judge's impartiality might reasonably be questioned, "including . . . the following circumstances: . . . (6) The judge: (a) served as a lawyer in the matter in controversy." Krause argues that, because the judge's impartiality might reasonably be questioned, the court "violate[d] the appearance of fairness doctrine" and erred by "refusing to recuse himself." However, Krause waived any error by failing to object to the judge's hearing the case in the trial court.

An appearance of fairness claim is not a constitutional error that a party may raise for the first time on appeal under RAP 2.5(a)(3). State v. Morgensen, 148 Wn. App. 81, 90-91, 197 P.3d 715 (2008). As in Morgensen, Krause "was aware of the potential for bias because"—to whatever extent the trial judge was Krause's attorney—Krause "knew that the trial judge had been his defense counsel in a previous case." Id. at 91. In such cases, "a litigant who proceeds to trial knowing of potential bias by the trial court waives [their] objection and cannot challenge the

court's qualifications on appeal." In re Welfare of Carpenter, 21 Wn. App. 814, 819-20, 587 P.2d 588 (1978) (where petitioner asserted a violation of "her right to a fair and impartial hearing"). A party may not speculate about a court's rulings at trial and then when the court does not rule in their favor, raise the issue of bias later on appeal. Id. at 820. Krause waived any basis for recusal.

V

Krause argues the State presented insufficient evidence to support count 4. We disagree.

"To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). "In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." Id. at 106. We must draw these inferences "from the evidence in favor of the State and interpret them most strongly against the defendant." State v. Duarte-Mares, 190 Wn. App. 343, 356, 361 P.3d 158 (2015). "Dismissal with prejudice is required when sufficient evidence did not support a conviction." State v. Yusuf, 21 Wn. App. 2d 960, 966, 512 P.3d 915, review denied, 200 Wn.2d 1011, 518 P.3d 206 (2022).

A.C. described that Krause "wanted to try anal, and I told him, no." Despite this, as they continued to have sex, "at one point the next thing [A.C.] knew" Krause was penetrating her anally. She explained, "I told him no multiple times and he kept doing it. And then I finally told him to, like, no. Stop. Loud enough. And he

stopped." This testimony describes a sequence of A.C. telling Krause she did not want to have anal sex and his penetrating her despite her saying no. She added that she thought "maybe it was like a slip up" and done "accidentally," but then A.C. "told him no and then it continued." In context, A.C.'s speculation that Krause's conduct might have been a mistake was not suggesting the possibility that it was, but explaining why it was not. A.C.'s testimony, viewed in the light most favorable to the State, is constitutionally sufficient to support the charge of rape in the third degree because a rational fact finder could conclude that Krause intentionally penetrated her without her consent. Duarte-Mares, 190 Wn. App. at 356.

VI

Because we reverse Krause's convictions, and the scope of the issues at any retrial would be different, it is unnecessary to address his claims that the trial court improperly admitted inflammatory evidence through A.L. and A.C., committed instructional error, and committed sentencing error.

Reversed and remanded.

_Birk, J._

WE CONCUR:

_____          _____

No. 84599-3-I <u>State of Washington v. Cole Edward Krause</u>

DíAZ, J. (dissenting) — I concur in part and respectfully dissent in part.

I agree with the majority that the trial court did not violate Krause's constitutional rights by declining to dismiss the count involving A.C.S. simply because the State had charged and dismissed the same crime in juvenile court; that Krause waived any argument that the trial judge improperly failed to recuse himself from this matter; and that there was sufficient evidence supporting the count of rape in the third degree of A.C. If I were in the majority, I, too, would not reach Krause's remaining assignments of error, given the basis on which they reverse the conviction.

I write separately primarily because I respectfully disagree with how my esteemed colleagues resolve the principal issue in this case: the trial court's denial of Krause's final motion to sever. While they provide an accurate, rigorous, and well-reasoned presentation of the tension in our caselaw, I understand and would apply the two-step analytic framework differently than the majority for two reasons.

First, the majority acknowledges our Supreme Court may not have "spoken with one voice" and—in their rightful desire to faithfully follow binding precedent—they closely hew to the more recent cases, rather than, as I believe we should, the full framework our Supreme Court announced decades ago to evaluate motions to sever. Majority at 2. It may be true that there is some difference in how older cases and recent cases conducted the analysis. <u>Id.</u> at 32. But I do not believe the more recent precedent abrogated the older line of cases which established, as the first step, four "factors" a trial court "must consider" in determining the quantum of

potential prejudice, where each factor independently guides that decision, where one factor may "offset" prejudice, and where no one factor "predominates."

Ultimately, perhaps our Supreme Court should clarify whether the four-factor analysis involves a "balancing" of the factors against each other to assess the presence or absence of prejudice, or whether the factors are simply "considerations," markers, or "aid[s] in searching out different kinds of prejudice," which "do not balance against one another," as the majority asserts, and each of which could be effectively dispositive. Id. at 15, n.3.

Second, I do not believe the more recent cases created a new binary test focused effectively only on cross-admissibility when a case involves allegations of sexual violence. The more recent cases further did not minimize the final step of the analysis, i.e., to weigh any "remaining prejudice" against legitimate interests in judicial economy, particularly in the time of a pandemic. Finally, it remains a defendant's burden to show, through the two-step framework, a manifest abuse of discretion.

The majority's opinion does not hold to the contrary, but the result of this case could suggest to trial courts that the test is more reductive than I believe it is. Perhaps our Supreme Court should clarify whether a trial court must treat the two-step framework or four-factor analysis differently in trials involving sexual violence.

But in this difficult case, on these facts, and following the traditional framework and standard of review, I would conclude Krause did not carry his burden to show the trial court manifestly abused its discretion and would affirm the jury's verdict.

I.      ANALYSIS

There is substantial preliminary agreement between the majority and me.  I

believe the majority

- provides the applicable standard of review, when it holds that the "'failure of the trial court to sever counts is reversible only upon a showing that the court's decision was a manifest abuse of discretion.'"  Majority at 14 (quoting State v. Bythrow, 114 Wn.2d 713, 717, 790 P.2d 154 (1990));

- holds rightly that a "'defendant seeking severance ha[s] the burden of demonstrating that a trial involving [all] counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.'"  Id. at 14 (alterations in original) (quoting State v. Slater, 197 Wn.2d 660, 676, 486 P.3d 873 (2021));

- lays out accurately the first step of the analytic framework, when it holds that, "'[i]n determining whether the potential for prejudice requires severance,'" a trial court must consider:

    (1)   the strength of the State's evidence on each count;
    (2)   the clarity of defenses as to each count;
    (3)   court instructions to the jury to consider each count separately; and
    (4)   the admissibility of evidence of the other charges even if not joined for trial,'" Id. at 15 (quoting Slater, 197 Wn.2d at 677), where

  "[n]o one factor is 'necessarily preeminent."  Id. at 15-16 (quoting State v. Watkins, 53 Wn. App. 264, 273 n.3, 766 P.2d 484 (1989));

  and

- properly recites the second step of the analytic framework, when it holds that, "[o]nce the court has determined the nature and the extent of any prejudice resulting from joinder, the court turns to the question whether any prejudice outweighs the judicial economy of joining the counts in one trial."  Id. at 32-33 (citing Slater, 197 Wn.2d at 677; State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994) ("In addition, any *residual* prejudice must be weighed against the need for judicial economy" as an "additional" step) (emphasis added)).

I further agree with the majority's conclusion as to factors (1), (2), and (4).

I  partially agree and partially disagree with the majority's treatment of the third

3

factor. I address each in turn before turning to perhaps the crux of the disagreement, i.e., how to use the factors, which is the first reason I write separately. I then will consider how the majority weighed the residual prejudice against, and how it characterized, the interests of judicial economy.

A. Step 1: Determining the Quantum of Prejudice via the Four-Factor Analysis

As to the first factor (the strength of the State's evidence on each count), I agree that "[t]his was not a case in which the State sought to shore up a weak count by joining it with a stronger one." Majority at 16. The majority accurately and respectfully describes the sexual assault the victims each testified Krause committed. I believe we unfortunately must discuss the details of the assaults more fully, as those details permit us to assess, albeit on a cold record, the strength of the State's evidence.

The three victims each testified at length, logically, and in vivid detail about the formation of their relationship with Krause and their own violent and painful rapes, including the consequence it had on them psychologically, academically, and/or physically. 7 Rep. of Proc. (RP) (Mar. 3, 2022) at 354-57 (relationship), 363-417 (rape), 424-25 (effect) (A.C.S.); 10 RP (Mar. 8, 2022) at 838-49 (relationship), 850-67 (rape) & 876 (effect) (A.L.); 11 RP (Mar. 9, 2022) at 1012-22 (relationship), 1023-36 (first rape), 1041-44 (second rape), & 1036-37 (effect) (A.C.). It would not have been an abuse of discretion for the court to find that there was no appreciable difference between the victims' testimony in terms of the level of specificity, clarity of statement, or coherence, each of which was quite compelling and often poignant. See, e.g., 7 RP (Mar. 3, 2022) at 405 (A.C.: "I

4

didn't want to be in that moment. All I wanted was to go home and do my chores that I would have been happy to do"); 10 RP (Mar. 8, 20222) at 865 (A.L.: "I remember him covering my mouth. I remember crying like a lot. I remember just being in pain"); 11 RP (Mar. 9, 2022) at 1043 (A.C.: "I cried. And I told him that I wanted him to go home, and I wanted to go home.").

Each victim also disclosed the fact of the rapes to their friends or family, and described similar difficulties prior to and at the time of disclosure. A.C.S. testified she told multiple friends as she walked home alone after the rape, and told her parents nearly immediately after Krause raped her, stating she was "scared" and started crying when she told her mom. A.L. initially delayed telling the police immediately because she too was "scared" as she "had seen how everyone had treated [A.C.S.]," but, when her father found text messages about the rape, she "broke down" and told him "everything that happened." A.C. testified that she wanted to go to the police, but "didn't want to deal with" it all or "have years of my life with court." But she relented only to "help" A.L. While there were minor differences in the timing or manner of disclosure, it would not have been an abuse of discretion for the court to find that the strength of these disclosures corroborating the victims' testimony was sufficiently similar in each case.

I emphasize these difficult facts, not to generate sympathy, but to stress how powerful the evidence in each case was. There was no semblance of bootstrapping one weaker case to a stronger case. Thus, I would conclude it was not an abuse of discretion to find, as the court did, that "[t]he strength of the State's case on each count is very similar." And, thus, this factor did not weigh in favor of

5

a finding of potential prejudice. Cf. State v. MacDonald, 122 Wn. App. 804, 815, 95 P.3d 1248 (2004) (reversing where "remarkably stronger" evidence in one case was tried together with an unrelated "weak" evidence in another case favored severance).

As to the second factor (the clarity of defenses as to each count), I agree with the majority that Krause's defenses were identical for all counts with the exception of one of his rapes of A.C., which generated "no prejudice." Majority at 17. I would add that each of his defenses was quite straightforward, in that he claims each encounter was consensual and the only difference was that, in one of his rapes of A.C. (count 3), he claims she was also *capable* of consenting. I would hold that this slight addendum to his defense was not materially complicating. In other words, Krause's trial strategy was clear and joinder did not "confound" or confuse his defenses. Cf. Bythrow, 114 Wn.2d at 718 (quoting State v. Smith, 74 Wn.2d 744, 755, 466 P.2d 571 (1968), judgment vacated in part on other grounds by Smith et al. v. Washington, 408 U.S. 934, 92 S. Ct. 2852, 33 L. Ed. 2d 747 (1972)).[1]

Thus, I agree with the majority's holding that the "State did not impair Krause's ability to maintain adequately consistent defenses to the charges by

---

[1] As to Krause's argument that the nature of the defense for count 3 required him to testify as to A.C.'s ability to consent, I would add that our Supreme Court has held that defendants are not required to testify in order to be entitled to an affirmative defense instruction. State v. Fisher, 185 Wn.2d 836, 850, 374 P.3d 1185 (2016). Moreover, both A.C. and Krause's own attorney elicited the names of at least four other witnesses who could have testified as to her level of intoxication that evening. He offers no explanation why he did not solicit, offer and rely on such testimony in lieu of waiving his Fifth Amendment right to remain silent. U.S. CONST. amend V.

presenting them at the same trial." Majority at 18. In turn, I would conclude it was not an abuse of discretion to find, as the court did in summary fashion, that as to the "[c]larity of the defenses, it appears to be the same defense as to all." And, thus, this factor did not weigh in favor of a finding of potential prejudice.

As to the third factor (court instructions to the jury to consider each count separately), Krause argues that some of the court's instructions were confusing and the State "overbor[e]" the instruction when repeatedly urging the jury to consider the victims as a "unified whole." In fact, as the majority accurately recounts, the court's most relevant instruction informed the jury that a "separate crime is charged in each count" and required them to "decide each count separately" as their "verdict on one count should not control [their] verdict on any other count." Majority at 18. There is no reason to believe the State "overbore" the court's instruction, when we presume jurors follow the court's instructions and when the State presented each case separately during trial and largely discussed the cases distinctly in closing argument. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008); cf. MacDonald, 122 Wn. App. at 815 (reversing where the State blended the cases). Thus, on this basis alone, I would conclude it was not an abuse of discretion to find, as the court did multiple times on the record, that the jury could "compartmentalize the allegations," i.e., keep each count separate, which is precisely what this factor requires a court to consider.

The majority, however, concludes that the "jury instructions did not mitigate the potential prejudice resulting from joining the counts in one trial" because "the instructions did not place any restrictions on the evidence the jury could use to

7

determine guilt." Majority at 19. This argument relies on the particular facts in Smith and on the majority's understanding of that case's original focus. Id. at 18, n.4 (citing Smith, 74 Wn.2d at 755).

But that is simply not how our Supreme Court articulated the factor in, I believe, every case since Smith, including Russell, 125 Wn.2d at 63, and as recently as Slater, 197 Wn.2d at 677. The Court could have gone back to Smith, and required courts to issue such limiting instructions, but it chose not to. Further, there is no other authority I am aware of that similarly weighs the absence of such a limiting instruction in favor of a finding of prejudice in this factor. And, clearly, the instructions the trial court did provide in this case meet the Russell/Slater standard, namely, that the jury to consider each count separately.

Even if we were to adopt the Smith test as factor three, the question still is whether Krause carried his burden to show that it was an abuse of discretion for the court to hold that the jury could "compartmentalize" the evidence with the instructions that were given. The majority's argument for this point relies on its conclusion for factor four (that "the evidence at issue was not admissible for any purpose on the joined counts"). Majority at 18-19. This point effectively "double dips" one fact (lack of cross-admissibility) into two factors. Without cross-admissibility, I otherwise do not understand how the instructions given or not increases, or at least does "not mitigate the potential for prejudice." Id. at 19.

Perhaps the thought is, as Krause argues, that the jury "was inclined to convict Krause of all charges based on the accumulation of claims" against him "regardless of the relative strength of the evidence," and that jury instructions could

8

not "ensure the jurors' passions would not be incensed." This point is also unavailing. The instructions included an admonition to the jury to "not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, prejudice, or personal preference." And, I agree with the majority that the "'[t]o convict' instructions required the jury to unanimously find each crime committed beyond a reasonable doubt." Majority at 19, n.5. There was no lessening of the burden of proof for any one charge, making any absence of an instruction likely to increase the potential for prejudice.

At most, I would say that a limiting instruction would have been preferable, and perhaps best practice, but that Krause has not carried his burden to show that this factor—in the aggregate and on the standard our Supreme Court has repeated over and over—weighed in favor of a finding of potential prejudice.

As to the fourth factor (the admissibility of evidence of the other charges even if not joined for trial, a.k.a., cross-admissibility), I agree with the majority that there is no common scheme and plan across the four charges.[2] And, as this was the only basis on which the State argued the evidence in the various cases were cross-admissible, it was an abuse of discretion for the court to find that this factor

---

[2] That said, there is substantial evidence that the rape of ACS and AL began with Krause (1) establishing an individual relationship with a younger and vulnerable classmate, detached from any existing relationships or acquaintances, and (2) then, after securing their trust, taking them to a place where they would be alone, with no other witnesses, where he would rape them. While there may be substantial evidence for these similarities, there were significant differences between the rapes of ACS and AL, on the one hand, and the rapes of AC on the other, which defeat the State's argument there was a common scheme or plan.

did not weigh in favor of a finding of potential prejudice.

The larger question here, however, is the nature or quantum of prejudice this factor generates, a fact which is necessary to know when balancing the potential prejudice against interests of judicial economy. The majority holds that, when multiple counts are joined at trial without cross-admissible evidence, the "risk of improper propensity inferences weighs *strongly* in favor of severance." Majority at 27 (emphasis added). They rely primarily on State v. Bluford, 188 Wn.2d 298, 305, 393 P.3d 1219 (2017) and Slater in reaching this conclusion. I review closely each case in turn.

As the majority acknowledges, our Supreme Court in Bluford considered a claim of improper *joinder* and not of improper severance because Bluford waived his motion for severance. Majority at 24, n.7 (citing Bluford, 188 Wn.2d at 306). While the concepts are "often considered together" and in "close relation," the Court there held that there are "distinctions between them" and laid out the different rule-based frameworks for each process. Bluford, 188 Wn.2d at 305-07.

I would hold that the Court's ensuing analysis is largely not pertinent to this case for a variety of reasons. The overarching focus of the analysis is on that prong of the *joinder* test that explores whether the offenses "[a]re of the same or similar character, even if not part of a single scheme or plan." Id. at 306 (alteration in original) (quoting CrR 4.3(a)(1)).[3] That is not anywhere in the severance analytic

---

[3] The United States Court of Appeals for the Ninth Circuit in United States v. Jawara, 474 F.3d 565, 578 (9th Cir. 2007), held a court should weigh the following six factors when determining whether charges were the "same or similar": (1) the elements of the statutory offenses, (2) the temporal proximity of the acts, (3) the likelihood and extent of evidentiary overlap, (4) the physical location of the acts,

framework. Then, the Court's first substantive holding was that prejudice, contrary to the State's position there, is a relevant consideration in the joinder analysis despite the absence of that term in the CrR 4.3(a)(1). Id. at 307-10. That is not a relevant holding here, as prejudice has been integral to the severance analysis for decades. The second major holding was that, contrary to Bluford's position, "[j]udicial economy is relevant to *joinder*" but, "if joinder will cause *clear, undue* prejudice to the defendant's substantial rights, no amount of judicial economy can justify requiring a defendant to endure an unfair trial." Id. at 311 (emphasis added). Again, there has never been a question that judicial economy is relevant to severance or that prejudice can outweigh judicial economy.

The Court did go on to hold that "[t]here are four factors to consider when determining whether joinder causes undue prejudice," reciting the four-factor severance test. Id. at 311-12 (quoting Russell, 125 Wn.2d at 63).[4] Crucially, however, the parties themselves focused "primarily" on the fourth factor, cross-admissibility, and the Court discussed *only* that factor and *only* whether the modus operandi exception to ER 404(b) applied. Id. at 312-14. The parties' arguments here are not remotely so circumscribed.

The Court then held the modus operandi exception did not apply, in part, because "the differences between the charges were notable, particularly as to the two [of nine] robberies accompanied by sexual offenses." Id. at 314. Even if this

---

(5) the modus operandi of the crimes, and (6) the identity of the victims. Only factor three is somewhat relevant to the severance analysis.

[4] I respectfully note that Russell was not a joinder case. The "issue raised [was] whether the trial court erred in denying Russell's motion to sever." Russell, 125 Wn.2d at 62.

were a relevant inquiry, here there is no such distinguishing feature in this case: all the crimes involve nearly identical types of sexual assaults.

The Court then briskly went from the holding that the modus exception did not apply to the holding that, thus, the State "would not have been required (or allowed) to call all of its witnesses in each separate trial." Id. at 315-16. The court explained that, as such, "the interest in judicial economy loses much of its force." Id. There were no further facts discussed weighing in favor of judicial economy.

At the end of the day, Bluford is nearly entirely distinguishable because it simply was not a severance case. There was nothing in the opinion about the strength of the State's nine separate charges across the nine victims. There was nothing in the opinion about the clarity of the defendant's defenses. The term "jury instruction" does not appear in the opinion. In short, when the State's modus operandi claim failed, there was no further discussion of facts that may have contextualized or minimized the quantum of prejudice, and the State apparently made no further argument to increase the interests of judicial economy. As will be discussed further below, none of that is the case here.

Turning to Slater, the defendant there unsuccessfully moved the trial court (1) to exclude the fact that he failed to appear (FTA) for a hearing as evidence of flight or evidence of consciousness of guilt and (2) to sever two entirely different types of charges, i.e., felony violation of a domestic violence no contact order and bail jumping, the latter arising from the FTA. 197 Wn.2d at 666. Our Supreme Court reversed the motion to exclude first, holding that "evidence of a single FTA accompanied by a prompt motion to quash the issued warrant is not sufficient

12

evidence of flight and, therefore, cannot be used as evidence from which to infer consciousness of guilt on the underlying crime." Id. at 671.

The court then began its analysis of the motion to sever by observing "[t]he judges in this case concluded that the facts surrounding Slater's charge of bail jumping are flight evidence admissible to prove consciousness of guilt as to the underlying offense. Because we hold that the FTA in this case is not evidence of flight, we now examine the motion to sever in light of that change in circumstance." Id. at 676.

As in Bluford, "Slater challenge[d] only the fourth factor." Id. at 677. Thus, as in Bluford, our Supreme Court did not discuss the strength of the State's charges, the clarity of the defenses, or the jury instructions given, again focusing only on the cross-admissibility of the charges. Id. at 677-78. The crux of the holding was that the trial court "judges were examining the proposed evidence under the mistaken conclusion that the FTA and bail jumping charge amounted to flight evidence with the purpose of inferring consciousness of guilt." Id. at 679. And, when that single justification was lost, "any remaining purpose for the admission of misconduct evidence would be (*as was stated during closing arguments*) to show that Slater is the type of person who violates court orders." Id. (emphasis added). Thus, the court's first holding was that the fourth factor was not met. Id.

Before continuing with the Court's further analysis, it is important to emphasize that our Supreme Court both in Slater and Bluford acknowledge that the absence of cross-admissibility "does not automatically mean that the charges

13

must be severed." Id.; Bluford, 188 Wn.2d at 315 ("The mere fact that evidence is not cross admissible does not automatically preclude joinder"). This recognition is important because it signals that cross-admissibility is not meant to be some super factor, but that it happened to be the only factor in dispute on the facts of those cases.

Accordingly, the Court went on to then conduct the second step of the analysis: whether the prejudice to the defendant outweighs the need for judicial economy. Slater, 197 Wn.2d at 679. The Court held that joinder created "higher than normal prejudice in trying these two charges together" for three reasons Id.

First, the Court found that the quantum of prejudice was greater because "both of the charges involve violations of court orders," meaning "trying the charges together presents a risk of improper propensity inferences." Id. at 679-80.

Second, as the majority accurately recounts, compounding this risk was the State's closing argument, which (a) strongly implied that Slater had a "propensity to violate court orders," thus, highlighting "the exact prejudice that Slater argued in his motion to sever," and (b) which the Court ruled was prosecutorial misconduct. Majority at 27 (quoting Slater, 197 Wn.2d at 683).

Third, joinder was particularly prejudicial there because the fact that "both of the charges involve violations of court orders . . . [was] the only similarity between the two charges as they are not connected or related in any way" and "the witnesses as to each charge in this case were different." Slater, 197 Wn.2d at 680.

Here, as to Slater's first reason, although they are not violations of court orders (and, thus, the risk of improper propensity inferences is different), the

14

crimes are similar classes of crimes and, thus, this fact does add to the potential prejudice. However, I would hold that the potential is, following Slater, no more than "higher than normal," and not overwhelming or severely so. Id. at 679. In Bluford, the Court "noted 'the inherently prejudicial effect of prior sexual offenses.'" 188 Wn.2d at 315 (quoting Bythrow, 114 Wn.2d at 718-19). But, it did not hold that cases involving sexual offenses should never be joined or are particularly or severely prejudicial. It would be surprising if it so held because why would the risk of an improper propensity inference in such cases be more prejudicial than, say, serial arson cases or car prowling cases. I do not believe either Bluford or Slater so held. The lesson is that tying similar cases together is more prejudicial than tying different types of cases together, but not to a degree that overwhelms the analysis. To the extent my esteemed colleagues in the majority suggest there is more than "higher than normal" prejudice in this case solely because of the nature of the offenses, I respectfully would disagree. Majority at 40 ("the similarity of two other inadmissible acts of rape raised the prejudice at least as much, and almost certainly more").

As to Slater's second reason, here unlike in Slater, there was no relevant claim of prosecutorial misconduct. There is no claim, as in Slater, that the State here commented on Krause's guilt, invited the jury to make improper inferences, or appealed to the juror's passions, based on the blending of the cases. 197 Wn.2d at 681-82. Instead, the majority points to two sentences in the State's closing argument—separated by about 80 pages in the transcript—that they claim evinces the State's unfair attempt to capitalize on the absence of cross-admissibility,

15

namely, when "it urged the jury to view them in common and give them 'one verdict.'" Majority at 40 (referencing 14 RP (Mar. 14, 2022) at 1366 & 14 RP (Mar. 14, 2022) at 1450). I respectfully submit that these two passing comments hardly rise to the level of the dozen, lengthy, and ultimately "inflammatory" comments the prosecution made in Slater, each of which our Supreme Court meticulously catalogued there. 197 Wn.2d at 681-83. I would hold that this compounding or aggravating factor is simply not present here.

As to Slater's third reason, as discussed above, there were some similarities to Krause's behavior between the charges, even if the State could not establish a common scheme or plan. See supra 10 n.2. And, as the majority acknowledges and discussed below, this case is at least "somewhat" distinguishable from Slater because "one or perhaps two or three witnesses [have] slightly overlapping" testimony, even if the majority characterizes it as "on somewhat peripheral points." Majority at 40.

In summary, as to the fourth factor, I would hold that Bluford is largely inapposite and Slater largely distinguishable, other than, given the similarity of the charges, this factor weighs in favor of a finding of prejudice. But I would also hold that the prejudice was only "higher than normal."

* * *

In considering the totality of the four factors, then, I would then conclude that it would not have been an abuse of discretion for the trial court to find that three of the four Russell factors do not weigh in favor of severance. 125 Wn.2d at 63. Because no "one factor is necessarily preeminent" and "all of the factors

16

*together* are a means of determining whether potential prejudice to a defendant requires severance," Watkins, 53 Wn. App. at 272 n.3 (emphasis added), I would hold that it would not have been an abuse of discretion for the trial court to find that the risk of potential prejudice was low. In other words, it would have been within its discretion for the trial court to find there was not "clear, undue prejudice," which the Court in Bluford held warranted reversal there, and the majority concludes is present here. 188 Wn.2d at 311; Majority at 1.

Ultimately, my disagreement with the majority may turn on *how* a trial court should utilize the four factors. For the majority, "it was the risk of an impermissible propensity inference that created the prejudice here," aggravated by the lack of a limiting instruction and the State's passing comments in its closing argument. Majority at 41, n.10. One factor and those simple facts appear to be enough for the majority. See id. at 1-2 (where the absence of cross-admissibility it mentioned six times). The majority explains its reasoning, stating that the factors are "considerations," which "aid in searching out different kinds of prejudice." Id. at 15, n.3. Importantly, the majority holds that the factors do not "balance against one another." Id. And the majority adds that, "if prejudice exists for instance because of an unfair inference of propensity, that is *not offset* for instance because the State is not also trying to unfairly bolster a weak count by joining it with a stronger one." Id. at 15-16, n. 3. As I understand their position, the factors are like genetic markers in a DNA assay, flagging an abnormality but not measuring health or eliminating disease. I respectfully disagree.

I look at the factors differently: I believe the factors are meant to be balanced against each other to assess the cumulative presence or absence of prejudice. We expressly so held nearly four decades ago in State v. York, 50 Wn. App. 446, 451, 749 P.2d 683 (1987), where we held that the court in Smith "noted several factors which may *offset* the prejudice from the joinder" and where we undertook the full analysis. (Emphasis added.)

This case presents a good explanation of why. The first three factors together show that this is a straightforward case, involving the same type and strength of allegations, the same types of quite clear defenses, and *requiring* only standard jury instructions ensuring independent convictions on each count. While the evidence is not cross-admissible, as will be discussed below, still there was some overlap, unlike in Slater, further minimizing the prejudice. Importantly, these are facts that would have been known to the trial court after the State rested. An attentive trial court judge sits in the best position, when focused on the right factors, to determine whether "severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b).

Looking at all four factors, I would hold Krause has not carried his burden to show the court would not have abused its discretion in finding little prejudice.

B. Step 2: Was the Joinder so Manifestly Prejudicial to Outweigh Economy

Turning to the next inquiry, as there is some "residual prejudice," we next "must" consider whether trying the counts together was so "manifestly prejudicial" as to outweigh the interests of judicial economy. Slater, 197 Wn.2d at 677. I would first remind the reader that "[t]he law does not favor separate trials." State v.

18

McCabe, 26 Wn. App. 2d 86, 94, 526 P.3d 891 (2023) (quoting State v. Huynh,

175 Wn. App. 896, 908, 307 P.3d 788 (2013)).  More specifically, as our Supreme

Court stated in Bythrow:

> A single trial obviously only requires one courtroom and judge. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is significantly reduced when the offenses are tried together. Furthermore, the reduced delay on the disposition of the criminal charges, in trial and through the appellate process, serves the public.

114 Wn.2d at 723.  In addition to these general considerations, there are at least

two additional sets of facts that increase the interest in judicial economy specific

to this case: the overlap of witness testimony and the reality of COVID.

The majority rightly begins its analysis by accurately laying out the first,

namely, the five "instances of evidence" that, while not "cross admissible," would

be "admissible on counts relating to the others."  Majority at 33.  In other words, as

the trial court noted, if the trial were severed, multiple witnesses, including the

victims, could be called to testify in multiple trials, i.e., there would be overlap

among witnesses.

The majority does not challenge this fact, but minimizes the impact on

judicial economy and secondarily the "necessity" of their testimony.  Id. at 32-35.

As to the former, the majority discounts the fact that, following severance, the State

would need to prepare and call, and three separate juries would need to hear from,

the lead detective across potentially three different trials over a period of potentially

months, holding only that "the State voluntarily chose to call [her] serially [in the

same trial] without inconvenience."  Id. at 36.  Similarly, the majority acknowledges

the "potential inconvenience to A.C. [who now lives out of state] that severed trials

would have implicated," but was not persuaded that the "marginal additional delay of severed trials … adds significantly to the weight of judicial economy." Id. at 39. Particularly because this impeaching testimony, as the majority admits, is "probative," I would not so easily diminish this overlap in witnesses. Id. at 34.

Even more importantly, as to the "necessity" of their testimony, I do not believe that is the standard. The majority holds several times that, while it may have been helpful to have or have been prepared for the testimony of all three victims, the State did not "need" or show it "was necessary" to put on the testimony of the other witnesses to effectively put on its case. Majority at 34-36; see also id. at 34-35 ("No evidence suggested that A.C.S. delayed reporting"); at 35 ("the State only proved it could try all the counts without" A.L.'s "knowledge of" A.C.S.' rape, or "A.L.'s state of mind" during her own rape); at 36 ("the State could effectively present the case" without A.C.'s motive in reporting, i.e., to help A.L.).

No authority that I am aware of, including our Supreme Court in Slater, established "necessity" as the standard for whether interests of judicial economy are enhanced by duplicative potential witnesses. Slater looked only for "overlap," not necessity, between witnesses. 197 Wn.2d at 680. I would not have held that it was an abuse of discretion to conclude there was at least some "interrelation" between the testimony, in the sense that the State would reasonably called each victim as a witness in at least *one* other case if the cases are tried separately.

Indeed, the State elicited important pieces of overlapping testimony without objection. For example, A.L. testified that, before she was raped, she accepted a ride home from Krause, and A.C.S.'s rape "play[ed] in [her] mind" when she was

20

in the car.  And in describing, not just the physical pain of her rape, but the "deep emotional pain," A.L. testified:

> I didn't think something like that would happen to me. Also, especially after, like, knowing what happened to [A.C.S.] and just accepting that I was going through exactly what I had said could never happen, you know, because all of us friends had spent so long sticking up for him . . .

Additionally, when asked why she did not go to the police immediately, A.L. testified she was "just scared. I had seen how everyone had treated [A.C.S.]" for reporting Krause raping her.  Finally, A.L. explained that she thought "in a lot of ways I blamed myself because I did know about" A.C.S.  Even if all the details of A.C.S.'s rape had not been admitted at A.L.'s separate trial, the State would reasonably have been prepared to call A.C.S. to testify to bolster A.L.'s testimony about how her rape unfolded, or at least the shaming which A.C.S. endured and which A.L. had hoped to avoid.

Similarly, in any retrial, the State likely would call A.L. to testify at A.C.'s trial.  According to A.C., at one point, they were best friends.  Both witnesses testified that A.L. told A.C. that Krause raped her also.  And that disclosure motivated A.C. to report her rape to the police to "help" A.L., testifying as follows:

> STATE: Up until that point, had you wanted to go to the police and tell them what had happened?
>
> A.C.: Yes.
>
> STATE: Had you done it, though?
>
> A.C.: No. . . .
>
> STATE: Why was it that you decided to come forward?
>
> A.C.: I wanted to help [A.L.].

21

> STATE: What do you mean?
>
> A.C.: I originally went to the police with a statement on just how me and Cole were in instances that had happened to me. I was not going there to have my own court case.

This testimony was important in two ways. A.L.'s testimony—even if the substance of the claim of rape were limited—would be admissible to explain the sequencing of A.C.'s reporting, even if Krause did not challenge the timing. Moreover, A.L.'s testimony would bolster A.C.'s credibility as it insulated her from any claims that she was simply a disgruntled former girlfriend. Instead, her motivation in reporting the assault was to support the rape allegations of her best friend.

For these reasons, I do not think it's an abuse of discretion for the trial court to have held that "the evidence really . . . . all builds off of itself from the various witnesses and I just don't see how in a single case, we wouldn't potentially have all of the same witnesses."

Indeed, Krause for his part concedes some of "this hearsay evidence was presented" at trial, but similarly tries to minimize its weight, arguing "it was hardly relevant [to] the claims in the individual counts." Krause emphasized this at oral argument, stating that this evidence was "not material." Wash. Ct. of Appeals oral argument, State v. Krause, No. 84599-3-I, at 6 min., 18 sec., through 7 min., 05 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024011546/?eventID=2024011546. But the question at this stage of the severance analysis (weighing the court's interest in judicial economy) is not materiality, but relevance, i.e., whether the same witnesses will have relevant facts

to testify to in different trials. Here, they would at least to some extent. Thus, I would hold that the trial court did not err in finding that there would have been overlap between the trials.

Finally, in his reply brief, Krause does not dispute that the interest in judicial economy was particularly pronounced because of the pandemic. The majority minimally mentions the pandemic, and minimizes its import, noting that the trial court "ultimately did not rely on the existence of COVID-19 protocols" in its final ruling on Krause's motion to sever, Majority at 12, and concluding that "the fact of trial under COVID-19 protocols [does not] add[] significantly to the weight of judicial economy"), id. at 39. I respectfully disagree with both statements.

The court's findings are more fulsome and trial court's concern with the ability to seat juries and reduce the backlog caused by the COVID-19 pandemic are legitimate and significant.

Prior to trial, in February 2022, the court held two hearings in which it discussed the motions with the parties. In the first hearing, the court asked the State how long two trials would take. After receiving the State's response, the court advised the parties, without ruling on the motions, that "everyone [should be] aware of how difficult it is to get jurors in and, frankly, where we put them," seemingly alluding to the pandemic protocols, which had delayed proceedings the prior year and had caused the suspension of trials in adjoining counties.

After the State rested and Krause had renewed his motion to sever, the court asked Krause to "address judicial economy" because "*[c]learly in COVID times and with the back log that no one has ever seen*, just this trial alone, the jury

23

selection essentially took three days. So if these were tried separately, we are looking at nine judicial days" for jury selection alone." (Emphasis added). Even if the trial court did not repeat these undeniable facts when ruling on the final motion to sever, these are clearly compelling interests.

In short, because there was some overlap in witnesses and a strong interest in trying the matters together during a pandemic, I would have held that Krause did not carry his burden to show the court abused its "considerable" discretion that trying all three matters together was manifestly prejudicial to any residual prejudice caused by only the lack of cross-admissibility. Bluford, 188 Wn.2d at 310.

Finally, the majority acknowledges that "other decisions of the Supreme Court point in a different direction" than their understanding of Bluford and Slater. Majority at 40. One of those cases is our Supreme Court's decision in State v. Markle, 118 Wn.2d 424, 439, 823 P.2d 1101 (1992), which I believe bolsters my understanding of this matter, as it addressed a somewhat similar situation, and is worthy of a more extended presentation.

There, the State charged the defendant with two counts of statutory rape (amended at trial to indecent liberties) against his niece, Lisa, which was joined with one count of indecent liberties against his other niece, Sonia. Id. at 427. Pre-trial, Markle moved unsuccessfully to sever the counts involving Lisa from the count involving Sonia. Id.

At trial, Sonia testified that, "once" when she slept overnight at Markle's residence with Lisa and other cousins, she observed the defendant with "his hand down in" Lisa's sleeping bag. Id. at 429. Sonia further testified that he did

something similar to her, namely, "while she was in her sleeping bag and seated on Mr. Markle's lap," he placed his hand inside her clothing and against her vagina. Id. Finally, she testified about a time he took the two driving, let them sit on his lap to hold the steering while, and, while doing so, rubbed her buttocks. Id.

Lisa testified that she "was around the defendant often . . . over a period of several years." Id. She testified about the sleeping bag incident and an incident similar to the driving incident, which Sonia had testified to. Id. But Lisa also testified about other instances of different types of inappropriate behavior where Sonia was not present. Id. These included an assault where Markle coerced her into drinking alcohol and violently assaulted her. Id. at 429-30.

Our Supreme Court found that that the "nature of the acts" and "the method of contact and abuse" were "similar" and "*in some instances* the defendant acted while both girls were present." Id. at 439 (emphasis added). The court further found that "the defendant was charged with acts of the same class of crimes or offenses, his acts were *in some instances connected*, and his offenses were properly joined in the information as separate counts." Id. (emphasis added). And the court held, "*[e]ven if separate counts would not be cross admissible in separate proceedings*, this does not as a matter of law state sufficient basis for the requisite showing by the defense that undue prejudice would result from a joint trial." Id. (emphasis added); see also State v. Kalakosky, 121 Wn.2d 525, 538, 852 P.2d 1064 (1993) ("severance is not necessarily mandated even if they were not so related. The fact that separate counts would not be cross admissible in separate proceedings does not necessarily represent a sufficient ground to sever as a

25

matter of law."); State v. McDaniel, 155 Wn. App. 829, 860-62, 230 P.3d 245 (2010) (holding "[o]n balance, severance was not necessary" where three of the four factors weighed against severance and despite the fact that the joined action was predicated on a juvenile charge that is "presumed inadmissible").

Here, Krause was charged with the same type (if not uniformly the same degree) of offenses, the acts were similar "in some instances," and were "in some instances" evidentiarily connected. In other words, as in Markle, the cases were similar in various ways, but dissimilar in others.

Thus, I would hold that the fact that one of the rapes (AC's first rape) was not cross admissible with the other three counts is not dispositive. We cannot say Krause carried his burden to show it was "manifest abuse of discretion" for the court to find all the factors, when weighed together and against the interests of judicial economy, did not favor severance. Russell, 125 Wn.2d at 63.[5]

---

[5] As to Krause's ER 404(b) challenge, I would have held that Krause waived his ER 404(b) assignment of error by his failure to move the court to exclude this evidence and to rule on such a motion *independently* from and in the alternative to his motion to sever. In his trial brief, Krause moved in limine, under ER 404, "to prohibit state witnesses from referring to . . . sexual relationships with young women *other than* [A.L.], [A.C.S.] and [A.C.], intended to show character or reputation of defendant regarding sexual behavior." (Emphasis added.) And at argument on the motions in limine, Krause did not move to exclude each rape from the other's trial based solely on ER 404(b). Krause's counsel thereafter mentioned ER 404(b) before or during trial, but always as part of his motion to sever the charges or in other unrelated contexts. If Krause wanted to move to exclude such evidence under ER 404(b), he would have needed to affirmatively assert that argument on that ground. The failure to do so results in waiver. State v. Kaiser, 161 Wn. App. 705, 718 n.4, 254 P.3d 850 (2011) ("Because Kaiser did not make this argument below, we decline to consider it for the first time on appeal.").

## II.    CONCLUSION

For the foregoing reasons, I concur in part and respectfully dissent in part from the majority opinion.

_Díaz, J._